[Civ. No. 29166. Second Dist., Div. Four. Mar. 20, 1967.]

BERNARD KUSMARK et al., Plaintiffs and Appellants, v. MONTGOMERY WARD & CO., INCORPORATED, Defendant and Respondent.

Whyte & Schifferman, John Whyte and Robert P. Schifferman for Plaintiffs and Appellants.

Belcher, Henzie & Biegenzahn and George M. Henzie for Defendant and Respondent.

FILES, P. J.—This action was brought to obtain a judicial interpretation of a lease by which plaintiffs, as landlord, leased real property to defendant, as tenant, for a term of 30 years commencing June 1, 1946. Plaintiffs' contention is that

defendant is obligated to raze the existing building and erect a new building on the premises suitable for its mercantile business. After a court trial in which extrinsic evidence was received, the court gave its judgment declaring that defendant was not obligated to build. Plaintiffs are appealing from that judgment.

The scope of appellate review in this kind of case is defined in *Parsons* v. *Bristol Development Co.*, 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839] : ''The interpretation of a written instrument, even though it involves what might properly be called questions of fact (see Thayer, Preliminary Treatise on Evidence, pp. 202-204), is essentially a judicial function to be exercised according to the generally accepted canons of interpretation so that the purposes of the instrument may be given effect. (See Civ. Code, §§ 1635-1661; Code Civ. Proc., §§ 1856-1866.) Extrinsic evidence is 'admissible to interpret the instrument, but not to give it a meaning to which it is not reasonably susceptible' [citations], and it is the instrument itself that must be given effect. (Civ. Code, §§ 1638, 1639; Code Civ. Proc., § 1856.) It is therefore solely a judicial function to interpret a written instrument unless the interpretation turns upon the credibility of extrinsic evidence. Accordingly, 'An appellate court is not bound by a construction of the contract based solely upon the terms of the written instrument without the aid of evidence [citations], where there is no conflict in the evidence [citations], or a determination has been made upon incompetent evidence [citation].' ''

Applying that standard, we have made our independent determination of the meaning of the lease. In our opinion, based upon the instrument itself, read in the light of surrounding circumstances shown by the evidence, defendant was not and is not obligated to build. The trial court's interpretation is correct. The judgment also contains some hypothetical declarations as to what the situation would be if the agreement had obligated defendant to build; but those declarations are now moot and require no further discussion.

Plaintiffs Bernard Kusmark, Will Forbes and Jerome Forbes, who are the lessors, were all, at the time of this transaction, real estate brokers, and all owned other commercial properties and had previously engaged in leasing commercial property. Defendant is a retail merchant which operates stores in many parts of the country, with its home office in Chicago, Illinois. As of early 1946, defendant was operating a store at

221 Main Street, in Alhambra, California. One portion of the store was upon property owned by Will and Jerome Forbes, leased to defendant for a term expiring in 1956. In July 1945 James A. Calderhead, a negotiator in defendant's real estate department, told Will Forbes he would like to find a location for a new store. Forbes showed him the property which is the subject of this action. It is located at the corner of Chapel and Main Streets, a half block from the old store. The Chapel corner was then improved with a one-story building renting for $300 per month and a service station renting for $149.50 per month.

In November 1945 Bernard Kusmark sent to defendant a written offer to lease the Chapel corner. One of the terms of the offer was ''You are to erect on said property . . . a building in accordance with your requirements.''

Then followed a series of negotiations, culminating on January 11, 1946, when the final form of the lease was signed by the lessors and transmitted to defendant for approval and execution at its home office.

Mr. Calderhead, Mr. DeYoung, the head of defendant's real estate department, and an attorney named Curtis negotiated for defendants. The three lessors dealt directly and through their attorneys. The final draft was prepared at a three-day meeting held in the office of the lessors' attorneys in Los Angeles. Also present at the final negotiations was a representative of Lincoln National Life Insurance Company, which was to loan the money for the new building.

During the three-day conference at which the final draft was produced, the lessors' attorney asked that the lease contain a definite date for the completion of the new building, but defendant refused. Mr. Curtis told the lessors and their attorney that it was defendant's policy not to commit itself to build on leased land. There is testimony that the lessors were told that defendant wanted the right to build but not the obligation to do so. If there could be any issue as to the credibility of this testimony it is put to rest by a specific finding by the trial court that defendant told plaintiffs, during the January 1946 negotiations, that it would refuse to agree to any clause fixing a deadline for the commencement of construction.

The lease, as it was executed, contains no express promise to construct a building at any time. Section 21 contains this language: ''The Tenant shall have in addition to but without limitation of the privileges granted it by Section 9 hereof, the

right to raze any improvements now on the demised premises and to erect thereon a new building, . . .''

Throughout the lease are detailed provisions which would be applicable only after a new store building is constructed, as well as provisions which would be applicable until construction of a new building. The lease calls for a fixed annual rent until a new store is built, and a percentage rent when a new store is opened.

Contemporaneously with the execution of the lease on the Chapel corner, defendant entered into a modification of its lease on the existing Main Street store whereby defendant obtained the privilege of canceling that lease within 90 days after opening a new store on the Chapel corner. At the same time defendant arranged for the Lincoln National Life Insurance Company to make a written commitment to lend $400,000 for the construction of a new building under section 21 of the lease.

Since the lease has been in force defendant has operated the service station on the corner and has used the one-story building there as a warehouse and for its mail-order business.

The trial court made a finding of fact that plaintiff Kusmark did not manifest to defendant that he considered the lease to contain any legal obligation to erect a building until May 12, 1955; and that the Forbes brothers never made such manifestation until October 4, 1959. This finding is supported by the record, which contains a detailed review of the communications between the parties from mid-1945 through 1959. All of the communications, down to the dates mentioned in the finding, are consistent with the view that defendant had the privilege but not the duty to build.

The significant circumstances surrounding the execution of the lease may be summarized thus: At the time of execution all parties expected that a new building would be constructed in the immediate future. This transaction took place within five months after the cessation of hostilities in World War II, when any careful businessman would realize that profound changes in economic conditions were imminent, though the force and direction of such changes could not be forecast with confidence. Defendant therefore bargained for a lease which would keep alternatives open. Plaintiffs fully understood the problem, and sought an express promise to build within a limited time. When defendant refused this, plaintiffs were willing to go ahead without it. The written instrument which

the attorneys jointly prepared must be regarded as an integration of that bargain. The writing contains no express promise to build, and none can be constructed by any process of interpretation based upon the extrinsic evidence in this record.

■ Plaintiffs have called attention to language in the fixed rent clause of the lease, section 2, which says: "provided, however, if the Tenant has not completed the construction of the new building mentioned in Section 21 hereof and opened its store therein on or prior to December 31, 1949, because of the Tenant's fault or neglect, then commencing on January 1, 1950, the Tenant shall pay a fixed rent hereunder at the annual rate of Fifteen Thousand Dollars. . . ." The evidence shows that in January 1950 plaintiffs wrote to defendant demanding that rent be paid at the $15,000 rate, and defendant has ever since paid rent at that rate. The words "fault or neglect" may be read to imply, as plaintiffs argue, the existence of a legal duty. But absent any language creating such a duty, some other interpretation of "fault or neglect" is required.

We think that the parties had in mind the material shortages and government controls which had halted nonessential construction during the war and immediately afterward. The parties recognized that so long as those conditions existed it would be impracticable or impossible for defendant to build, and no financial penalty should be imposed for a delay caused by such conditions. To distinguish between that situation and a refusal to build based upon defendant's free choice, the latter was loosely described as "because of the Tenant's fault or neglect."

Plaintiffs attempt to build an argument upon the fact that defendant did, on August 3, 1945, enter into a lease for some property in Portsmouth, Ohio. That lease contains much language similar to that found in the Chapel corner lease with respect to a new store to be constructed on the premises. However, the Portsmouth lease provides in section 22 that the tenant shall, within 180 days after execution of the lease, submit plans for the new building, and shall commence work within 3 years after all governmental restrictions on civilian construction have been removed. This evidence establishes two things: The first is that defendant did on one occasion depart from what it says was its policy not to commit itself to build on leased land. The second is that this was accomplished by inserting in the Portsmouth lease the language which plaintiffs demanded and defendant refused to include

in the Chapel corner lease. The Portsmouth lease offers no support for the argument which has been made.

■ Plaintiffs also argue that they are entitled to prevail under Civil Code section 1649 which reads: "If the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it."

In attempting to make a case under that section plaintiffs offered in evidence this portion of the deposition of defendant's negotiator, Calderhead:

"Q. Did you believe at the time of these negotiations that the lessors understood that Montgomery Ward was committing itself to build on the Main and Chapel corner?

"A. Yes."

At the trial defendant objected to this question upon several grounds, and the objection was sustained upon the ground that it called for a conclusion.

The ruling cannot be sustained on that ground. Civil Code section 1649 makes the belief of a promisor a significant fact whenever that section apples. Here the promisor is a corporation, and the mental state of its negotiator, who dealt directly with the promisee, is a fact to be considered in determining the belief to be imputed to the corporation. The question called for Mr. Calderhead's testimony as to his own belief, a subject upon which he was a competent witness. (*Cope* v. *Davison*, 30 Cal.2d 193, 200 [180 P.2d 873, 171 A.L.R. 667].) The materiality of Calderhead's answer depends upon whether his belief has any bearing upon the interpretation of the contract.

Defendant's counsel argues that the Calderhead testimony on this subject should be disregarded because the witness was neither the promisor nor an agent authorized to bind the promisor, that he was only one of three negotiators, that his superior, DeYoung, had also been present, that Calderhead's testimony was not specific as to the time he was referring to, and that at the time of the deposition Calderhead was 76 years of age, had left defendant's employ in 1948, and had since suffered a paralytic stroke. But we are reluctant to say that these circumstances justify exclusion of the testimony.

For the purpose of this case we need not decide whether Calderhead's belief need be regarded as the belief of his corporate employer. ■ Plaintiff's argument rests on the untenable proposition that "The excluded evidence was decisive of obligation under the terms of Civil Code section

1649.'' The cases which plaintiffs cite for their theory are all cases which held that evidence of surrounding circumstances was admissible to aid the court in construing a written agreement. None of the authorities suggests any support for plaintiffs' extreme proposition that section 1649 overrides all other rules for the interpretation of contracts. It is not necessary here to make any generalizations as to the effect of section 1649. It is enough to say that that section has no decisive effect here. By its terms section 1649 applies only to a contract which is ambiguous or uncertain. We have already pointed out that the writing contains no promise to build. We have also reviewed the evidence of the surrounding circumstances, and have observed that this evidence confirms the understanding of the parties as it was expressed in the writing. This record so clearly eliminates any uncertainty that there is no room for any application of section 1649.

If we give full weight to the excluded testimony by considering it along with all of the other evidence which this reviewing court is entitled to consider under the *Parsons* rule, it does not change the result. As opposed to Calderhead's belief, we have the fact that plaintiffs were experienced property managers, represented by able counsel, who had arrived at a bargain after the most intensive arm's-length negotiations. Of course they knew they had failed to obtain the building clause which they had sought. In the light of the whole evidence, the ruling on the question about Calderhead's belief is of no consequence.

The judgment is affirmed.

Jefferson, J., and Kingsley, J., concurred.