[Civ. No. 38158. Second Dist., Div. Four. July 5, 1972.]

HOLLISTER COMPANY et al.,
Plaintiffs, Cross-defendants and Respondents, v.
CAL-L EXPLORATION CORP.,
Defendant, Cross-complainant and Appellant;
SOUTHERN CALIFORNIA EDISON, Cross-defendant and Respondent;
SABRE PETROLEUM CORPORATION,
Intervener and Appellant.

714

## COUNSEL

Johnson & Stanton, Gardiner Johnson, Thomas E. Stanton, Jr., Brelsford, McMahon & Butcher, Dennis D. Butcher and William A. Tookey for Defendant, Cross-complainant and Appellant and for Intervener and Appellant.

Musick, Peeler & Garrett, Jesse R. O'Malley, Lawrence E. Stickney, Griffith & Thornburgh and Lloyd E. Iverson for Plaintiffs, Cross-defendants and Respondents and for Cross-defendant and Respondent.

## OPINION

**FILES, P. J.**—This is an appeal from a judgment after a court trial cancelling and terminating an oil and gas lease and quieting title to the subject property as against the lease and appellants on the ground that the lessee, appellant Cal-L Exploration Corp. (Cal-L), had failed to comply with the drilling requirements of the lease.

The lease in question was entered into June 1, 1964, replacing an earlier lease between the same parties dated March 1, 1959. The original lessor was Hollister Estate Company, a corporation (Estate). In 1965 Hollister Company, a joint venture (Hollister) purchased the property from Estate and succeeded to the lessor's interest under the lease.

The default which was charged in the complaint and found by the trial court as a basis for its judgment was a violation of the following clause in paragraph 3 of the lease:

"3. Lessee agrees to start the drilling of a well for oil and/or gas on the leased premises on or before August 30, 1964 (90 days after the date of execution hereof) and thereafter to continue the work of drilling such well with due diligence until such well is completed or abandoned. Until oil is discovered in paying quantities, Lessee agrees to commence the drilling of a well within ninety (90) days after the abandonment of each well drilled, and to operate continuously and diligently one string of tools, allowing ninety (90) days between the abandoment of one well and the commencement of the drilling of the next succeeding well."

Notice of default was given by Hollister on July 18, 1966. In accordance with paragraph 18 of the lease the lessee was given 45 days within which

to remedy the default. Notice of termination of the lease was given by Hollister on September 27, 1966.

It is undisputed that there had been a cessation of drilling since March 14, 1966. It was also clearly established that neither oil nor gas had ever been discovered in paying quantities.

### Interpretation of the Lease

■ Cal-L contends there was no default because it was permitted to accumulate drilling credits. It points to language in paragraph 4 of the lease which it says has a bearing on the meaning of paragraph 3.

Paragraph 4 provides that "After the discovery of oil or gas in paying quantities" lessee shall operate one string of tools continuously, allowing 90 days between the completion of one well and the commencement of the next. Paragraph 4 also contains this language:

"Notwithstanding anything to the contrary in this paragraph contained, it is understood that if Lessee elects to commence drilling subsequent wells at a lesser interval than ninety (90) days after the completion or abandonment of a preceding well, Lessee shall be entitled to credit for the time within which it shall be required to drill subsequent wells, which credit shall be equal to the number of days less than 90 days within which Lessee commenced drilling. Said credit shall be cumulative and may be applied in computing the time for drilling any future well or wells until said credit has been used up."

The fact is that in 1964 and 1965 Cal-L drilled several wells in quick succession, so that if it was entitled to cumulative credit (as is provided in paragraph 4) it had until September 20, 1967 within which to start the next well.

The trial court received extrinsic evidence offered to assist in the interpretation of the lease. In a memorandum written at the close of the evidence the trial court said: "Such parol evidence sheds no light on the matter. It does not show that the parties intended that the lessee could cumulate drilling credits *before* the discovery of oil or gas in paying quantities." (Italics in original.) The trial court then construed the lease to mean what it says literally: that the right to cumulate drilling credits, as set forth in paragraph 4, modifies only "this paragraph," and does not modify the duty imposed upon the lessee prior to discovery in paragraph 3.

We have reexamined the trial court's interpretation in the light of the principles laid down in *Estate of Dodge* (1971) 6 Cal.3d 311, 318 [98

Cal.Rptr. 801, 491 P.2d 385], and *Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839], and are satisfied that that interpretation is correct. Certain contentions made by Cal-L in support of a different meaning will be mentioned briefly.

■ (1) Paragraph 47 of the 1964 lease provided "each party hereto declares that the other is not now in default under the previous lease . . . and that each waives any cause of action which each might have had against the other for any reason whatsoever arising prior to the execution of this agreement." The drilling requirements under the 1959 lease were the same as in the 1964 lease; and unless Cal-L was entitled to cumulate drilling credits, it was in default immediately prior to the execution of the new lease. Cal-L argues from this that the language in paragraph 47 is an agreement by the lessor that the lessee was entitled to cumulate credits.

The proper interpretation of paragraph 47 is that by entering into a new lease each party waived any default which had occurred theretofore. The statement that each "is not now in default" does not mean that there had not been defaults. By entering into the 1964 agreement the lessor became estopped to assert claims based upon any default which had occurred under the old lease (see *The Texas Co.* v. *Wieczorek* (1940) 36 Cal.App.2d 560 [98 P.2d 547]) but it did not estop itself to terminate the new lease if the lessee defaulted under it.

■ (2) Cal-L produced in evidence a memorandum written by Mr. J. J. Hollister III, a member of the board of directors of Estate, which contains the statement that "Cal-L has accumulated oil exploration operations to the extent that it need drill only one well in 1964 to satisfy its drilling commitments under the old lease." Mr. Hollister testified that this writing was a private memorandum of a negotiating session with representatives of Cal-L. He had written down "various factors" which had been brought up "by various parties." He said that statement had been made by Stanley Schwartz, who was representing Cal-L in the negotiations. Mr. Hollister also testified: "My concern as a member of the board was specifically to create a contractual relationship with Cal-L Exploration Corporation which would result in their drilling, finding or not finding oil—if they find it, to have them produce it and, if they didn't find it, to have them gone from the property. All my efforts were directed toward that . . ."

Upon this record it was reasonable for the trial court to conclude that Mr. Hollister's memorandum did not reflect any interpretation that Cal-L had cumulative drilling rights prior to discovery.

■ (3) On November 19, 1965, Hollister sent Cal-L a notice of default specifying nine alleged defaults. Failure to drill in compliance with paragraph 3 of the lease was not mentioned, although that could have been made a ground of default if the cumulative clause did not apply. Cal-L argues that the purpose of the November 19, 1965 notice was to get rid of the lease, and therefore Hollister surely would have specified the failure to drill if it had believed the defendants were not entitled to cumulative credits.

Hollister's explanation is that it was not trying to get rid of the lessee when it gave the November 19, 1965 notice. That notice listed a number of housekeeping deficiencies, as to such matters as trash on the premises, sump holes and roads, which Hollister wanted corrected. Cal-L had represented that it was about to do some more drilling immediately, so Hollister preferred at that time to demand performance of the minor housekeeping duties and keep the lease in force, notwithstanding the lessee's default under the drilling clause.

Hollister's forbearance to terminate the lease in 1965 for default in drilling did not operate either as an interpretation of the lease or a bar to declaring a default in 1966 for the continuing breach. (*Extension Oil Co.* v. *Richfield Oil Corp.* (1942) 52 Cal.App.2d 105 [125 P.2d 895].)

■ (4) Mr. Masek, secretary and a director of the Hollister Company at the time the 1964 lease was negotiated, testified that he thought the lessee had cumulative drilling under the old lease both before and after discovery of oil and gas in paying quantities. The belief of one man, not communicated to the other party, and inconsistent with the terms of the written agreement, is not controlling. (See *Kusmark* v. *Montgomery Ward & Co.* (1967) 249 Cal.App.2d 585, 591-592 [57 Cal.Rptr. 678].)

### The Executive Right

Cal-L makes 3 contentions which require an analysis of the relationship between Hollister and some individual owners of mineral rights in the property. These contentions are (1) the notice of default was defective in that some holders of mineral rights did not join in it; (2) indispensable parties were not joined in this action; and (3) default was waived by certain mineral right holders who accepted rent after the notice of default had been given by Hollister on July 18, 1966.

On July 6, 1962 Hollister Estate Company, by grant deed, conveyed to its shareholders as tenants in common (to each in proportion to his stock ownership) 50 percent of the minerals and mineral rights in the subject property. The deed also contained this provision:

"Excepting And Reserving unto Grantor and its successors and assigns, the sole and exclusive right and power to enter into and execute leases and agreements for the purpose of prospecting, exploring and mining for minerals thereon, and for the purpose of extracting and transporting minerals; and the right to do any and all things on said real property necessary or proper for mining purposes, or for the purpose of mining, or boring or exploring for oil or other minerals thereon.

"The exclusive leasing power reserved herein by Grantor (which power is sometimes referred to as an 'executive right') shall not be construed as a general power of appointment, but, on the contrary, is expressly intended to be an incorporeal hereditament, carved out of the total mineral estate, and constituting a burden thereon, as an incident to Grantor's own retained mineral estate.

"The herein reserved exclusive leasing power shall be exercisable by Grantor for the mutual benefit of Grantor and the respective Grantees of the fractional mineral interest conveyed hereby.

"The herein reserved leasing power shall survive the death of the respective Grantees hereunder, and said exclusive leasing power shall be an alienable, descendable and devisable estate in the real property.

"It is the intention of the Grantor that the undivided mineral interests transferred to the Grantees by this Deed, which do not carry any right in the individual grantees to execute leases for development of said oil, gas and minerals (and which are sometimes referred to as 'non-executive interests') shall be presently vested and alienable estates and not contingent interests in the real property. Said interests shall carry not only the right to share in royalties, but also the right to share in any bonuses and/or lease rentals obtained in the development of the mineral estates."

When Estate conveyed the real property to Hollister in 1964, the latter succeeded to the former's mineral rights and the executive right.

In July 1965 holders of nonexecutive mineral interests totalling 38.765 percent executed deeds which granted their rights to extract minerals to Hollister, and Hollister deeded to those individuals a right to share in the royalties, bonuses and mineral lease rentals which would accrue to it. The holders of 11.235 percent of the mineral interests did not participate in this exchange of deeds.

■ Cal-L invokes the rule that where property subject to a lease is owned by cotenants, forfeiture of the lease can be brought about only by the joint action of all of the lessors. (See *Jameson* v. *Chanslor-Canfield M. Oil Co.* (1917) 176 Cal. 1, 6 [167 P. 369].)

The interest of the individual mineral right holders "as tenants in common" was, by the terms of their deeds, limited by the reservation of the exclusive leasing power, which was described in the form of a property interest reserved by the grantor. This special reservation of power was created in 1962, before the subject lease was entered into. Cal-L dealt with Estate, and later with Hollister, as the holder of that executive right or power, whereby a lease was made covering the entire mineral interest in the subject real property.

This method of holding the leasing power in a single party is a practical and legally unobjectionable means of simplifying the lessor-lessee relationship. The parties found it convenient and agreeable when they were dealing with each other, and there appears to be no reason why the courts should not recognize and apply it as the parties intended. Estate entered into the lease as sole lessor, under its executive right, and Estate's successor in interest, Hollister, was equally qualified to act alone in giving notice of default. The rule of the *Jameson* case, *supra,* is not applicable, because here there was only one lessor, and that party is enforcing the lease.

■ Indispensable parties to actions are defined in Code of Civil Procedure section 389 as follows: "A person is an indispensable party to an action if his absence will prevent the court from rendering any effective judgment between the parties or would seriously prejudice any party before the court or if his interest would be inequitably affected or jeopardized by a judgment rendered between the parties."

For the purpose of an action such as this one the position of the holder of the executive right is analogous to that of a trustee of an express trust, who is authorized by Code of Civil Procedure section 369 to sue without joining the persons for whose benefit the action is prosecuted. Since the holders of the nonexecutive mineral rights look to the holder of the executive right to protect their interests, both in making leases and enforcing them, they will be bound by the judgment, insofar as it decides that the lease has been terminated. No one will be prejudiced by their nonjoinder. The holders of the mineral interests are thus not indispensable parties.

■ The same reasoning precludes treating the acceptance of rent by the mineral holders as a waiver of default. The executive right would be unworkable if holders of nonexecutive interests had power to countermand the action taken by the executive.

*Other Contentions*

Cal-L contends that Hollister had no authority to exercise the executive right to terminate the lease because that right must be exercised "for the

mutual benefit of Grantor and the respective Grantees," i.e., Hollister and the mineral interest holders. Cal-L says termination of the lease was not for the benefit of the mineral interest holders. The gist of Cal-L's theory seems to be that Hollister was interested in developing the property in other ways, it had made sales of parts of the property, and it desired to get rid of the oil lease to facilitate such development. Hollister, as owner of the surface rights, had an interest which was in conflict with the interest of those who owned only mineral rights.

This case was not the occasion to determine whether or not the owners of the nonexecutive mineral interests had any grievances against Hollister. Cal-L does not point to any evidence in the record which would require a finding that Hollister exceeded its authority under the executive right to such an extent as to make its acts ineffective as to Cal-L.

Cal-L also contends that Hollister, as lessor, breached its duty of good faith towards the lessee, by various transactions which allegedly clouded the title of the lessee and otherwise interfered with its operations to the extent that its failure of performance should be excused. This issue was tried at length and the trial court made findings of fact adverse to Cal-L. These findings are adequately supported by the evidence.

The judgment is affirmed.

Jefferson, J., and Irwin, J.,* concurred.

A petition for a rehearing was denied July 31, 1972, and appellants' petition for a hearing by the Supreme Court was denied August 30, 1972.

---

*Retired judge of the superior court sitting under assignment by the Chairman the Judicial Council.