[Nos. E001138, E001340. Fourth Dist., Div. Two. Sept. 13, 1985.]

CITIZENS ASSOCIATION FOR SENSIBLE DEVELOPMENT OF BISHOP AREA et al., Plaintiffs and Appellants, v.
COUNTY OF INYO et al., Defendants and Respondents;
CRUMPLER AND KRUGER COMMERCIAL REAL ESTATE, INC., et al., Real Parties in Interest and Respondents.

154

COUNSEL

Leonardini & Associates and Sharon E. Duggan for Plaintiffs and Appellants.

Dennis L. Myers, County Counsel, for Defendants and Respondents.

Ave Buchwald, Myron Blumberg and Charles Elwyn Karpinski for Real Parties in Interest and Respondents.

OPINION

MORRIS, P. J.—Plaintiffs, Citizens Association for Sensible Development of Bishop Area, et al. (Citizens), appeal from judgments denying its petitions for injunctive relief and for a writ of mandate setting aside and vacating two actions of the Inyo County Board of Supervisors (Board or Board of Supervisors), to wit: (1) the December 6, 1983 action approving Bishop general plan amendments 83-10 and 83-11, zoning reclassification 83-23, and two negative declarations in support of these actions, and (2) the March 6, 1984 action approving tentative tract map 188, road abandonment 83.2, variance 83.4A, and a negative declaration in support of the tentative tract map and road abandonment. On appeal plaintiffs contend that an adequate environmental review pursuant to the California Environment Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.) was not conducted.

FACTS

On or about September 27, 1983, Crumpler and Kruger Commercial Real Estate, Inc. (Crumpler and Kruger, Inc.), as the buyer in escrow of property located on the north side of U.S. Route 395 east of Barlow Lane in Bishop, California, filed an application with the County of Inyo for approval of a proposed shopping center. The application described the proposed 9.1 acre shopping center as regionally oriented, with an area of 86,500 square feet, which was to be built in one phase. An additional expansion of 12,000 square feet was anticipated for the Safeway store already at the proposed shopping center location. The application also stated that Inyo County approval would be needed for a general plan amendment, rezoning, a street abandonment, new street alignments, and a zoning variance, and that Caltrans authorization would be needed for an encroachment permit. A transportation study was also filed.

In considering the proposed shopping center, the County of Inyo divided the required approvals, along with corresponding environmental review, into two groups. First, it considered Bishop general plan amendments 83-10 and 83-11 and zone reclassification 83-23, which were to redesignate 3.4 acres from office/professional and highway commercial to retail commercial

and rezone from retail commercial/highway commercial to retail commercial. Second, it considered tentative tract map 188, which was to resubdivide 15 lots on 7 acres into 5 lots and realign portions of 4 streets, and road abandonment 83.2. The variance requested, although not subject to an environmental analysis, was also considered in this second grouping.

Beginning with the general plan amendments and zoning reclassification, the Inyo County Planning Department completed two initial environmental studies on October 5, 1983. The studies, which generally used a checklist format, found no significant environmental effects, and recommended issuance of draft negative declarations, which were posted the next day. At the end of the 15-day review and comment period as provided in article 5.6, subdivision (c) of the Inyo County Procedures for Environmental Impact Review (now art. IX, subd. (c)), the planning commission held a public hearing which culminated in its written recommendation that the board adopt the general plan amendments, zoning reclassification, and negative declarations. In the planning commission's discussion of its recommendation it expressly stated that traffic would be evaluated at the time the tentative tract map was submitted, as would the requirements for water, sewer, and fire protection. The recommendation was "formally appeal[ed]" by a letter signed by seven people and received on November 14, 1983. A subsequent letter to the Board detailed the concerns that 39 signers felt justified an environmental impact report (EIR); other letters in support and against the recommendations of the planning commission were also received.

Thereafter, on December 6, 1983, the Board held a public hearing at the end of which it decided to adopt all of the planning commission's recommendations regarding the shopping center project. Notices of determination indicating the adoption of the negative declarations were posted the next day. All plaintiffs except Citizens Association for Sensible Development of Bishop Area (Citizens Association) timely filed a writ of mandate with the trial court; Citizens Association was added as a party plaintiff by amendment to the writ after the statute of limitations had passed. This describes case No. E001138.

The second group of approvals followed a similar path as the first group, only starting a short time later. On December 7, 1983, the planning department completed an initial environmental study, again generally using a checklist format, of tentative tract map 188 and road abandonment 83-2. This study also recommended issuance of a draft negative declaration. The planning commission adopted the tentative tract map, road abandonment and negative declaration, as well as variance 83-4, on January 25, 1984. Twen-

ty-one residents of Bishop appealed that decision, providing a lengthy statement of their reasons for that appeal.

The Board conducted a public hearing on March 6, 1984. It was advised by the planning commission that any discussion of the concurrent consideration of the general plan amendments and zoning reclassifications was irrelevant. At the end of the hearing the board of supervisors denied the appeal, with appropriate notices of determination following on May 14, 1984. All plaintiffs timely filed a second writ of mandate which was to become case No. E001340.

In both case No. E001138 and case No. E001340 the trial court denied any relief to the plaintiffs. Two appeals followed. Because of the similarity of the facts and issues in these two cases, this court ordered their consolidation prior to oral argument.

## DISCUSSION

## THRESHOLD ISSUES

### 1. *Standing*

Defendants contend that none of the approximately 20 plaintiffs had standing to apply for writs of mandate. We disagree.

■ To have standing to apply for a writ of mandate a private citizen must be a "party beneficially interested." (Code Civ. Proc., § 1086.) Generally, a beneficial interest is established only when a plaintiff " '. . . has some private or particular interest to be subserved, or some particular right to be preserved or protected, independent of that which he holds with the public at large.' " (*Kappadahl* v. *Alcan Pacific Co.* (1963) 222 Cal.App.2d 626, 643 [35 Cal.Rptr. 354], quoting 32 Cal.Jur.2d, Mandamus, § 55, p. 238, disapproved on other grounds in *Topanga Assn. for a Scenic Community* v. *County of Los Angeles* (1974) 11 Cal.3d 506, 517, fn. 16 [113 Cal.Rptr. 836, 522 P.2d 12].) However, where a public right is involved, and the object of the writ of mandate is to procure enforcement of a public duty, the plaintiff is not required to have any legal or special interest in the result; it is sufficient that as a citizen he is interested in having the public duty enforced. (*Id.*, citing 35 Am.Jur., § 320, p. 73.) Accordingly, in a writ of mandate against a municipal entity based on alleged violations of CEQA, a property owner, taxpayer, or elector who establishes a geographical nexus with the site of the challenged project has standing. (32 Cal.Jur.2d, Mandamus, § 56, pp. 239-241; see *Bozung* v. *Local Agency*

*Formation Com.* (1975) 13 Cal.3d 263, 272 [118 Cal.Rptr. 249, 529 P.2d 1017]; *Scott* v. *City of Indian Wells* (1972) 6 Cal.3d 541, 549 [99 Cal.Rptr. 745, 492 P.2d 1137].) Moreover, the geographical nexus can be attenuated, for instance beyond the city limits, because "[e]ffects of environmental abuse are not contained by political lines." (*Bozung* v. *Local Agency Formation Com., supra,* 13 Cal.3d 263, 272.)

Defendants' contention is that despite the ease of establishing standing in a case such as the instant one, plaintiffs have failed to do so. Defendants base this contention on "[t]he general rule . . . that in a mandamus proceeding the burden is on the petitioner to prove every fact that is at the foundation of his proceeding excepting such allegations of the petition as are admitted by the answer. [Citations.]" (*Lotus Car Ltd.* v. *Municipal Court* (1968) 263 Cal.App.2d 264, 270 [69 Cal.Rptr. 384].) Real parties in interest assert that because their answer denied plaintiffs' allegations of standing, and plaintiffs never offered proof of this foundational fact, that plaintiffs' cause of action is fatally deficient in this regard.

In fact, some of the plaintiffs offered proof of their standing and others had their standing established by the first answer of defendants, who filed a separate answer from real parties in interest in each case. In case No. E001138 three parties, Mary Baker, Steve Votaw and Dwayne Wilson, testified as to their standing under oath before the Board. In addition, in case No. E001138 Ms. Baker and Mr. Votaw, as well as ten other plaintiffs (Russell Adams, Del Harper, Pauline Krueger, Don Lauria, Al Norris, Leslie Riccomini, Rodney Rusco, Dick Solesbee, Joe Wilkerson and Susan Wilson), had their standing established by the answer of defendants, which was filed two days after real parties in interest's less knowledgeable answer.

Moreover, the trial court appeared to have found that all plaintiffs had standing. During the hearing on case No. E001138 the court told plaintiffs' counsel that the action was not frivolous because plaintiffs had "a right to be [t]here and be heard." In a very small community like Bishop, the trial court often has personal knowledge of the standing of the parties where such standing consists merely of a taxpayer's geographical nexus with the subject matter of the dispute. (See Evid. Code, § 452, subd. (g).) The trial court's formal holdings in each case are not inconsistent with our conclusion that the court found plaintiffs to have standing.

## 2. *Addition of Party After Statute of Limitations Had Passed*

Defendants contend that Citizens Association improperly injected itself into the litigation without leave of the court after the statute of limitations

had passed. This contention lacks merit. Even if defendants were correct, the only effect would be the dismissal of Citizens Association from civil case No. E001138, the first of the two consolidated cases.

It is clear that a ". . . court may, in furtherance of justice, . . . allow a party to amend any pleading or proceeding by adding . . . the name of any party, . . ." (Code Civ. Proc., § 473.) ■ When there is an attempt to add a party after the statute of limitations has run, however, relation back to the original pleadings is "dependent upon whether recovery is sought on the same general set of facts as those [originally] alleged." (*Austin* v. *Massachusetts Bonding & Insurance Co.* (1961) 56 Cal.2d 596, 601 [15 Cal.Rptr. 817, 364 P.2d 681]; see *Lamont* v. *Wolfe* (1983) 142 Cal.App.3d 375, 381 [190 Cal.Rptr. 874].)

When recovery is sought on the same basic set of facts, the main policy of the statute of limitations, to put defendants on notice of the need to defend against a claim in time to prepare a fair defense on the merits, is satisfied. (*Lamont* v. *Wolfe, supra,* 142 Cal.App.3d at pp. 380-381.) Here the mere addition of a party plaintiff did not alter the general set of facts originally alleged; thus, defendants were not prejudiced and no reasonable purpose would have been served by dismissing Citizens Association from case No. E001138.

Defendants do not directly contest the applicability of *Austin* and its progeny, including *Lamont,* to the instant case. Instead, defendants contend that plaintiffs' first amended petition was properly denied because Citizens Association never sought permission to be included as a petitioner. In support of this contention defendants correctly state that under Code of Civil Procedure section 472 plaintiffs did not have a right to add a party plaintiff as a matter of course. (See *Phoenix of Hartford Ins. Companies* v. *Colony Kitchens* (1976) 57 Cal.App.3d 140, 147 [128 Cal.Rptr. 893]; *Taliaferro* v. *Davis* (1963) 220 Cal.App.2d 793, 795 [34 Cal.Rptr. 120].) Nevertheless, it does not follow from this record that plaintiffs never sought nor obtained permission to add Citizens Association. In adding Citizens Association as the named party plaintiff by amended petition, plaintiffs at least implicitly sought the appropriate judicial authorization. Further, when the trial court told plaintiffs during oral argument that they had a right to be there it appeared to confirm that permission had been granted. Finally, the fact that the trial court did not strike the amended complaint, and thus *dismiss* Citizens Association from the petition, in combination with the fact that the trial court's ultimate decision not to grant the petition was expressly based on other grounds, support the conclusion that the court permitted Citizens Association to be included as a party plaintiff.

### 3. *Indispensable Party*

Defendants contend that dismissal of case No. E001138 is warranted because of plaintiffs' failure to name an indispensable party, the owner of the subject property, in its petition for writ of mandate. The trial court did not specifically rule on this issue. However, we hold that the petition, which was limited to challenging governmental actions and approvals of general plan amendments and zoning reclassifications, did not require the inclusion of the owner of the subject property.

Code of Civil Procedure section 389 sets out the pertinent law. In relevant part it states that: "(a) A person . . . shall be joined as a party in the action if . . . he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest . . . . [¶] (b) If a person as described [above] cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed without prejudice, the absent person being thus regarded as indispensable. The factors to be considered by the court include: (1) to what extent a judgment rendered in the person's absence might be prejudicial to him or those already parties; (2) the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; (3) whether a judgment rendered in the person's absence will be adequate; (4) whether the plaintiff or cross-complainant will have an adequate remedy if the action is dismissed for nonjoinder." (Code Civ. Proc., § 389, subd. (a), (b).)

Although the owner of the subject property would have been a proper real party in interest, such owner was not a necessary party because as a practical matter his ability to protect his interest was not impaired or impeded. Instead, that interest was ably argued by Crumpler and Kruger, Inc., as a real party in interest. Moreover, because Crumpler and Kruger, Inc. had an option to purchase the subject property from the owner and was in escrow, its interests were essentially the same as if it had been the owner for the purposes of this litigation. Thus, pursuant to the analogous reasoning of *Hollister Co.* v. *Cal-L Exploration Corp.* (1972) 26 Cal.App.3d 713, 721 [102 Cal.Rptr. 919], and Code of Civil Procedure section 369, which allow the nonjoinder of interested parties where their interests are adequately represented, we hold that the owner of the subject property was not a necessary party. (See also *Hebbard* v. *Colgrove* (1972) 28 Cal.App.3d 1017, 1027 [105 Cal.Rptr. 172].) The case cited by real parties in interest, *Sierra Club, Inc.* v. *California Coastal Com.* (1979) 95 Cal.App.3d 495, 501 [157

Cal.Rptr. 190], is inapposite because there the real party in interest's legal right to a permit was not represented by any party in a similar position.

Even if the owner of the subject property was impaired in his ability to protect that interest, the owner was not indispensable. The Supreme Court provided guidance in this regard when it cautioned against the common blunder of finding any necessary party as indispensable and observed that ". . . we should . . . be careful to avoid converting a discretionary power or a rule of fairness in procedure into an arbitrary and burdensome require-ment which may thwart rather than accomplish justice." (*Bank of California* v. *Superior Court* (1940) 16 Cal.2d 516, 521 [106 P.2d 879]; see *Kraus* v. *Willow Park Public Golf Course* (1977) 73 Cal.App.3d 354, 368-369 [140 Cal.Rptr. 744].)

In "equity and good conscience" we find that pursuant to Code of Civil Procedure section 389 the owner of the subject property was not an indis-pensable party. The litigation in case No. E001138 generally involved the propriety of the government's actions in approving the general plan amend-ments and zoning reclassification urged by the developer (and named real party in interest) who had an option to purchase the subject property from the owner and was in escrow. Although the developer has self-servingly declared that it does not intend to exercise its option to purchase from the owner if judgment is for plaintiffs, none of the other factors listed in Code of Civil Procedure section 389, subdivision (b), favor dismissing this action for nonjoinder of the property owner. Those already parties will not be prejudiced by a judgment rendered in the owner's absence, the judgment will be adequate to fully resolve the dispute (cf. *Sierra Club, Inc.* v. *Cali-fornia Coastal Com., supra,* 95 Cal.App.3d at p. 501), and plaintiffs would be without a remedy if the action is dismissed for nonjoinder (see Code Civ. Proc., § 389, subd. (b)).

### 4. *Exhaustion of Administrative Remedies*

Defendants contend that before an issue may be litigated by plaintiffs it must have been raised by them before the administrative agency. Although we generally agree with this legal principle, we find it to have been satisfied here with regard to all critical substantive issues.

The Supreme Court has applied the doctrine of exhaustion of administra-tive remedies and its underlying reasoning to environmental litigation. In *Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247, 267 [104 Cal.Rptr. 761, 502 P.2d 1049], the Supreme Court held that: "[T]he Board is entitled to learn the contentions of interested parties before litigation is

instituted. If [plaintiffs] have previously sought administrative relief . . . the Board will have had its opportunity to act and to render litigation unnecessary, if it had chosen to do so." (See also *Wilke & Holzheiser, Inc.* v. *Dept. of Alcoholic Bev. Control* (1966) 65 Cal.2d 349, 377, fn. 23 [55 Cal.Rptr. 23, 420 P.2d 735]; *Borror* v. *Department of Investment* (1971) 15 Cal.App.3d 531, 545 [92 Cal.Rptr. 525].)

■ On the other hand, less specificity is required to preserve an issue for appeal in an administrative proceeding than in a judicial proceeding. This is because " '[i]n administrative proceedings, [parties] generally are not represented by counsel. To hold such parties to knowledge of the technical rules of evidence and to the penalty of waiver for failure to make a timely and specific objection would be unfair to them.' (Note (1964) Hastings L.J. 369, 371.) It is no hardship, however, to require a layman to make known what facts are contested." (*Kirby* v. *Alcoholic Bev. etc. Appeals Bd.* (1970) 8 Cal.App.3d 1009, 1020 [87 Cal.Rptr. 908].)

Because we find that the dispositive issue and all relevant substantive issues save one were sufficiently raised before the administrative body, it is unnecessary to consider whether any exceptions to the exhaustion doctrine are applicable here.

Factually, plaintiffs raised the failure to consider the cumulative effect of the project by articulating their concerns about the deterioration of the downtown area and the increase in traffic in a letter signed by 39 people which was sent to the Board of Supervisors prior to the administrative hearing before the Board on the general plan amendments and zoning reclassification. All other substantive issues except one discussed herein were also introduced by letter or by oral comment at the administrative hearing. Resolution of the one pertinent issue not raised before the administrative body, whether Caltrans was a responsible agency and thus whether copies of any or all of the negative declarations were required to be forwarded to the Commerce Clearinghouse pursuant to California Administrative Code, title 14, section 15073, subdivision (c), is not a necessary part of the judgment of this court.

### 5. *Standard of Review*

There are two standards of review applicable to legal controversies which involve CEQA: Public Resources Code section 21168 or 21168.5. (*No Oil, Inc.* v. *City of Los Angeles* (1974) 13 Cal.3d 68, 74, fn. 3 [118 Cal.Rptr. 34, 529 P.2d 66].) ■ Despite the fact that both sides to the instant dispute initially stated that section 21168.5 was here applicable (later, in

case No. E001340, plaintiffs alleged that section 21168 was controlling), we conclude that section 21168 is the correct standard of review.

Public Resources Code section 21168 states that: "Any action or proceeding to attack, review, set aside, void or annul a determination, finding, or decision of a public agency, made as a result of a proceeding in which by law a hearing is required to be given, evidence is required to be taken and discretion in the determination of facts is vested in a public agency, on the grounds of noncompliance with the provisions of this division, shall be *in accordance with the provisions of Section 1094.5 of the Code of Civil Procedure.* [¶] In any such action, the court shall not exercise its independent judgment on the evidence but shall only determine whether the act or decision is supported by substantial evidence in light of the whole record." (Italics added.) Here section 21168 is controlling because our review is of a decision of a public agency in which the Inyo County Procedures for Environmental Impact Review, article 7.5 (now art. XV), prescribes a hearing for the administrative appeals that here occurred. Further, CEQA requires the taking of evidence. (Cal. Admin. Code, tit. 14, § 15064.) Finally, discretion in the determination of facts is vested in the public agency. (*Id.; Newberry Springs Water Assn.* v. *County of San Bernardino* (1984) 150 Cal.App.3d 740, 750 [198 Cal.Rptr. 100]; *Brentwood Assn. for No Drilling, Inc.* v. *City of Los Angeles* (1982) 134 Cal.App.3d 491, 504 [184 Cal.Rptr. 664].)

Having found Public Resources Code section 21168 applicable, it should be noted that the distinction between that section and Public Resources Code section 21168.5 may often be immaterial. (See *Newberry Springs Water Assn.* v. *County of San Bernardino, supra,* 150 Cal.App.3d at p. 748.) Without deciding whether the distinction is here material, we hold that pursuant to Code of Civil Procedure section 1094.5, subdivision (b), "[a]buse of discretion is established if the [administrative agency] has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence."

DISPOSITIVE ISSUE: FAILURE TO CONSIDER THE
CUMULATIVE EFFECT OF THE PROJECT

1. *Overview*

 Plaintiff contends because the Board as the lead agency failed to consider the cumulative effect of the development project the trial court erred in ruling that the lead agency proceeded in the manner required by law. We agree.

In evaluating the actions of the lead agency in light of the guidelines provided by CEQA, we note, in the words of the Supreme Court, " 'that the Legislature intended [CEQA] to be interpreted in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language.' " (*No Oil, Inc.* v. *City of Los Angeles, supra,* 13 Cal.3d at p. 83, quoting *Friends of Mammoth* v. *Board of Supervisors, supra,* 8 Cal.3d at p. 259.) Accordingly, "CEQA requires more than merely preparing environmental documents." (Cal. Admin. Code, tit. 14, § 15002, subd. (h).)

## 2. *Definition of a Project*

■ Of particular relevance here, CEQA mandates ". . . that environmental considerations do not become submerged by chopping a large project into many little ones—each with a minimal potential impact on the environment—which cumulatively may have disastrous consequences." (*Bozung* v. *Local Agency Formation Com., supra,* 13 Cal.3d at pp. 283-284; see *Rural Landowners Assn.* v. *City Council* (1983) 143 Cal.App.3d 1013, 1024 [192 Cal.Rptr. 325].) In part, CEQA avoids such a result by defining the term "project" broadly. (Cal. Admin. Code, tit. 14, § 15002, subd. (d).) " 'Project' means the whole of an action, which has a potential for resulting in a physical change in the environment, directly or ultimately, . . ." (Cal. Admin. Code, tit. 14, § 15378, subd. (a).) "The term 'project' refers to the activity which is being approved and which may be subject to several discretionary approvals by governmental agencies. The term 'project' does not mean each separate governmental approval. [¶] . . . Where the lead agency could describe the project as either the adoption of a particular regulation . . . or as a development proposal which will be subject to several governmental approvals . . . the lead agency shall describe the project as the development proposal for the purpose of environmental analysis." (Cal. Admin. Code, tit. 14, § 15378, subds. (c)-(d); see *Fullerton Joint Union High School Dist.* v. *State Bd. of Education* (1982) 32 Cal.3d 779, 795 [187 Cal.Rptr. 398, 654 P.2d 168]; *Bozung* v. *Local Agency Formation Com., supra,* 13 Cal.3d at pp. 283-284; cf. *Rural Landowners Assn.* v. *City Council, supra,* 143 Cal.App.3d at pp. 1024-1025.)

■ In the instant case for environmental purposes the project before the lead agency should have been described as a shopping center development for which governmental action consisting of general plan amendments, zone reclassification, tentative tract map approval, and road abandonment was required. Instead, the project was improperly described as "two projects": (1) the general plan amendments and zone reclassification, and (2) the tentative tract map approval and road abandonment. Each of the "two

projects" was submitted to a separate environmental review for which separate negative declarations were approved by the Board on December 6, 1983, and March 6, 1984, respectively.

### 3. *Failure to Consider Cumulative Effect*

The danger of filing separate environmental documents for the same project is that consideration of the cumulative impact on the environment of the two halves of the project may not occur. This danger was here realized.

In approving the first negative declarations the lead agency considered the general plan amendments and zoning reclassification only; it did not consider the second half of the project. The transmittal letter from the planning commission to the Board of Supervisors stated that ". . . the property . . . is proposed for development with a shopping center. . . .

". . . . . . . . . . . . . . . . . . . . . . .

"At the time the tentative map is considered by the Commission (in December) requirements for water, sewer, fire protection, traffic circulation, curbs, gutters, sidewalks, etc. will be determined. However, at this time we are only considering the General Plan Amendments and the Zoning Reclassification." During the hearing before the Board of Supervisors, Planning Director Hilton, the first speaker, suggested the planning commission's rationale for this division of the shopping center project into two parts with separate negative declarations when he stated that "[i]t would really [be] kind of redundant to get into the details of planning for a tentative tract map and vacating the street if the basic General Plan classifications and rezoning cannot be accomplished." At the end of the hearing the Board, acting as the decisionmaking body (see Inyo County Procedures for Environmental Impact Review, art. 4.3 (now art. III)) and thus, the lead agency (see Pub. Resources Code, § 21067), approved the first two negative declarations.

In approving the subsequent negative declaration a few months later the same pattern was repeated as with the first two negative declarations, except in reverse. The agency considered the tentative tract map approval and road abandonment only; it did not consider the first half of the project. This time the transmittal letter from the planning commission to the Board of Supervisors stated that "[t]he project before the Planning Commission was not a shopping center since the existing zoning automatically permits that type of land use. . . . The appeal talks about approval of a shopping center. . . . The discussion of the Bishop Central Business District; Regional Community Center; Community-Neighborhood Center is totally irrelevant as a

shopping center or any other retail commercial development is a permitted use on the site. [¶] The discussion of the concurrent consideration of general plan amendments and zone reclassifications is also irrelevant. These actions, taken by the Board on December 6, 1983 were done properly and legally and are currently under litigation. They have nothing to do with the planning commission's actions of January 25," i.e., adoption of the negative declaration for the tentative tract map and road abandonment. Finally, at the hearing before the Board of Supervisors, when some citizens raised concerns about the general plan amendments and rezoning, Mr. Hilton responded that ". . . this Board has already approved and the planning commission has approved the general plan change and the rezoning on the property. This is a secondary but important part of the development of the shopping center. . . . [However], I don't think anything can be gained by rehashing over it." Later in this hearing the Board of Supervisors approved the negative declaration for the second stage of the shopping center project.

The division of the shopping center project into two parts constituted an abuse of discretion by the lead agency. As the portions of the record above vividly demonstrate, although for the same shopping center project, the first two negative declarations and the later negative declaration were considered as mutually exclusive environmental documents. This approach is inconsistent with the mandate of CEQA that a large project shall not be divided into little ones because such division can improperly submerge the aggregate environmental considerations of the total project. (See *Bozung* v. *Local Agency Formation Com.*, *supra,* 13 Cal.3d at pp. 283-284.)

### 4. *Prejudice*

We further hold that this abuse of discretion requires reversal. In an analogous situation it was held in *Rural Landowners Assn.* v. *City Council,* *supra,* 143 Cal.App.3d at page 1023, ". . . where that failure to comply with the law results in a subversion of the purposes of CEQA by omitting information from the environmental review process, the error is prejudicial. The trial court may not exercise its independent judgment on the omitted material by determining whether the ultimate decision of the lead agency would have been affected had the law been followed. The decision is for the discretion of the agency, and not the courts." The same reasoning applies to this case. The purposes of CEQA were subverted because the lead agency never considered whether the environmental effects of the total shopping center project, properly defined, were significantly adverse and thus required an EIR. At this juncture, as in *Rural Land Owners Assn.,* we cannot exercise our independent judgment on whether the ultimate decision of the lead agency would have been different had CEQA been properly

implemented because such a decision is for the discretion of the agency. (See *Cleary* v. *County of Stanislaus* (1981) 118 Cal.App.3d 348, 362 [173 Cal.Rptr. 390]; *People* v. *County of Kern* (1974) 39 Cal.App.3d 830, 842 [115 Cal.Rptr. 67].)

Nevertheless, we believe there is a reasonable probability that the lead agency would have prepared one EIR instead of two sets of negative declarations if it had properly defined the project. The Bishop community plan recommended a thorough economic-environmental analysis before development of a regional-community shopping center. One of the five Board members voted against the negative declarations for both the general plan amendments/rezoning and tentative tract map/street abandonment approvals. Both sets of negative declarations were appealed and received substantial public criticism. Finally, the aggregate concerns, including physical deterioration of the downtown business area because of business loss and closure due to competition from the new shopping center and added traffic, were not insignificant.

## 5. *Reasonably Foreseeable Probable Future Projects*

■ Upon remand, defendant should also consider the reasonably foreseeable probable future projects, if any, that will be added in the shopping center area. The environmental "effects of probable future projects" are germane to determining whether the impact of the shopping center is "cumulatively considerable." (Cal. Admin. Code, tit. 14, § 15065, subd. (c); see Cal. Admin. Code, tit. 14, § 15355, subd. (b).) In formulating its list of probable future projects for review as to cumulative effects the lead agency should reasonably interpret the guidelines to afford the fullest possible protection of the environment. (See *Friends of Mammoth* v. *Board of Supervisors, supra,* 8 Cal.3d at p. 259; *San Franciscans for Reasonable Growth* v. *City and County of San Francisco* (1984) 151 Cal.App.3d 61, 74 [198 Cal.Rptr. 634].) There is a ". . . need for regional environmental consideration at the earliest stage of a planned development before it gains irreversible momentum." (*Bozung* v. *Local Agency Formation Com., supra,* 13 Cal.3d at p. 284, fn. 28.)

Related projects currently under environmental review unequivocally qualify as probable future projects to be considered in a cumulative analysis. (*San Franciscans for Reasonable Growth* v. *City and County of San Francisco, supra,* at p. 74, fn. 13.) In addition, even projects anticipated beyond the near future should be analyzed for their cumulative effect. (*Bozung* v. *Local Agency Formation Com., supra,* 13 Cal.3d at p. 284.)

In the instant case it appears that probable future projects include the development of three of the five lots which will not initially be developed with the proposed shopping center, but "will eventually be developed with satellite buildings (i.e., bank, offices, service station, restaurant)," and the approximately 265 single-family dwelling units "planned for" north of the shopping center. To the extent the lead agency properly considered these projects in the negative declarations under review, this discussion is intended to affirm the need to do so again.

## OTHER ISSUES TO BE CONSIDERED ON REMAND

### 1. *Relevance of Secondary Effects Caused by Economic and Social Changes*

■ Plaintiffs contend that the environmental consequences of economic and social changes must be considered by the lead agency. Specifically, plaintiffs contend that the lead agency must consider whether the proposed shopping center will take business away from the downtown shopping area and thereby cause business closures and eventual physical deterioration of downtown Bishop. Although the administrative code is somewhat ambiguous on this issue, we conclude that it supports plaintiffs' position.

Title 14, section 15064, subdivision (d) of the California Administrative Code states that, "[i]n evaluating the significance of the environmental effect of a project, the lead agency *shall* consider both primary or direct and secondary or indirect consequences." (Italics added.) This is further explained as follows: "Primary consequences are immediately related to the project such as the dust, noise, and traffic of heavy equipment that would result from construction of a sewage treatment plant and possible odors from operation of the plant. [¶] . . . Secondary consequences are related more to effects of the primary consequences than to the project itself and may be several steps removed from the project in a chain of cause and effect. For example, the construction of a new sewage treatment plant may facilitate population growth in the service area due to the increase in sewage treatment capacity and may lead to an increase in air pollution." (*Ibid.*)

The unequivocal language just cited becomes less clear in the light of a subsequent passage: "Economic and social changes resulting from a project shall not be treated as significant effects on the environment. Economic or social changes may be used, however, to determine that a physical change shall be regarded as a significant effect on the environment. Where a physical change is caused by economic or social effects of a project, the physical change may be regarded as a significant effect in the same manner as any other physical change resulting from the project. Alternatively, economic

and social effects of a physical change may be used to determine that the physical change is a significant effect on the environment. If the physical change causes adverse economic or social effects on people, those adverse effects may be used as the basis for determining that the physical change is significant. For example, if a project would cause overcrowding of a public facility and the overcrowding causes an adverse effect on people, the overcrowding would be regarded as a significant effect." (Cal. Admin. Code, tit. 14, § 15064, subd. (f).)

These two subsections should be interpreted consistently if possible. (58 Cal.Jur.3d, Statutes, § 106, pp. 481-482.) In this case the most reasonable consistent interpretation is that the lead agency *shall* consider the secondary or indirect environmental consequences of economic and social changes, but *may* find them to be insignificant. Such an interpretation is unequivocally consistent with the mandate that secondary consequences of projects be considered. Moreover, this interpretation is also consistent with subdivision (f). In particular two aspects of subdivision (f) support this conclusion. First, subdivision (f) expressly gives the agency discretion to determine whether the consequences of economic and social changes are significant, which is not the same as discretion to not consider these consequences at all. Indeed, ". . . the physical change [caused by economic or social effects of a project] may be regarded as a significant effect *in the same manner* as any other physical change resulting from the project [may be regarded as a significant effect]." (Cal. Admin. Code, tit. 14, § 15064, subd. (f), italics added.) Second, in the example provided in subdivision (f) of an adverse effect ultimately caused by economic or social changes, subdivision (f) concludes that the physical change "would be [rather than could be] regarded as a significant effect." (Cal. Admin. Code, tit. 14, § 15064, subd. (f).) Consistent with this example is the one provided in subdivision (d), which mandates that secondary consequences be considered, including added air pollution (an environmental effect) caused by the population growth (presumably a social change) facilitated by a new sewage treatment plant. (Cal. Admin. Code, tit. 14, § 15064, subd. (d).)

In the instant case plaintiffs have urged the lead agency to consider whether the proposed shopping center would deprive the downtown business district of necessary revenue, forcing business closures and eventual physical deterioration of the downtown area. Two of the four members of the Board of Supervisors who voted for the negative declarations stated that they failed to see how this was an environmental consequence they needed to consider; the other two expressed no opinion. The fifth supervisor believed that an EIR was necessary and therefore voted against the negative declarations.

On remand the lead agency should consider physical deterioration of the downtown area to the extent that potential is demonstrated to be an indirect environmental effect of the proposed shopping center.

2. *Adequacy of Initial Studies*

In administering its responsibilities under CEQA the public agency should implement procedures which contain at least provisions for: conducting initial studies, preparing negative declarations or drafting final EIRs, assuring adequate opportunity and time for public review and comment, evaluating and responding to those comments, and filing documents required by CEQA. (Cal. Admin. Code, tit. 14, § 15022; see Pub. Resources Code, § 21082.)

An important purpose of the initial study is to "[p]rovide documentation of the factual basis for the finding in a negative declaration that a project will not have a significant effect on the environment; . . ." (Cal. Admin. Code, tit. 14, § 15063, subd. (c)(5).) This purpose is particularly relevant to courts reviewing the administrative action pursuant to Public Resources Code section 21168. As discussed above, Public Resources Code section 21168, and thereby Code of Civil Procedure section 1094.5, apply to the instant case. Section 1094.5, subdivision (b), states that "[a]buse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, *or the findings are not supported by the evidence*." (Italics added.) The Supreme Court has elaborated that ". . . implicit in section 1094.5 is a requirement that the agency which renders the challenged decision must set forth findings to bridge the analytic gap between the *raw evidence* and ultimate decision or order." (*Topanga Assn. for a Scenic Community* v. *County of Los Angeles, supra,* 11 Cal.3d at p. 515, italics added; see *Myers* v. *Board of Supervisors* (1976) 58 Cal.App.3d 413, 429-431 [129 Cal.Rptr. 902].)

▇▇▇ Therefore, although an initial study can identify environmental effects by use of a checklist (see Cal. Admin. Code, tit. 14, § 15063, subds. (d)-(f)), it must also disclose the data or evidence upon which the person(s) conducting the study relied. Mere conclusions simply provide no vehicle for judicial review. (See *Topanga Assn. for a Scenic Community* v. *County of Los Angeles, supra,* 11 Cal.3d at p. 516.)

In the instant case the initial studies are far too conclusionary. It is for the most part impossible to determine whether the findings which ultimately resulted in negative declarations are supported by the evidence because it is unclear what raw evidence, if any, was relied upon in preparing the initial

studies. There were three similar initial studies made, two for the general plan amendments and the zoning reclassification, and one for the tentative tract map and road abandonment. The core of the studies was a quasi-checklist format. For each subcategory (e.g., water supply, sewage disposal, fire protection) the planning department indicated by use of letters whether the impact was adverse, beneficial, or none, and then the degree, phase, linkage and duration. To the extent a negative impact was identified, mitigation measures, if any, were described in the margin and summarized later in the study. Neither the source nor the content of the information relied upon for the more than 45 subcategories which required environmental conclusions in each initial study were specifically identified. In the space that was intended to identify the "departments/agencies/groups consulted" and list "comments" the words "to be" [consulted] were added and no comments were listed in any of the three initial studies. Of course, Crumpler and Kruger, Inc., as the developer, submitted information to the planning commission with its applications for the changes eventually made, but, with the notable exception of a traffic study, even this information was conclusionary. For the most part the specific sources and content of the data the developer relied upon in its application were not disclosed. Upon remand the evidence supporting any initial studies should be disclosed.

### 3. *Sufficiency of Evidence Introduced During Public Review Period*

Plaintiffs and defendants disagree on whether evidence substantial enough to require an EIR was offered during the public review. Although our remand of this case for the reasons stated above makes resolving this specific dispute unnecessary, a few general comments may provide some guidance on remand.

The public comment or review period is a second important informational step to be completed by the lead agency before approving a negative declaration. (See Cal. Admin. Code, tit. 14, § 15073, subd. (a).) "[T]he lead agency shall consider . . . any comments received during the public review process. The decision-making body shall approve the negative declaration if it finds on the basis of the initial study and any comments received that there is no substantial evidence that the project will have a significant effect on the environment." (Cal. Admin. Code, tit. 14, § 15074, subd. (b); see Pub. Resources Code, § 21083; *Friends of "B" Street* v. *City of Hayward* (1980) 106 Cal.App.3d 988, 999-1000 [165 Cal.Rptr. 514].)

A court reviewing the public comment portion of the administrative record is limited to evaluating whether there is substantial evidence to support ". . . the county's decision regarding whether there was adequate evi-

dence produced by plaintiffs so that a fair argument could be made that a significant environmental impact may result from the project." (*Newberry Springs Water Assn.* v. *County of San Bernardino, supra,* 150 Cal.App.3d at p. 747; see *Friends of "B" Street* v. *City of Hayward, supra,* 106 Cal.App.3d at p. 1002.) Under this substantial evidence standard of review, the court may not substitute its own judgment for that of the local agency. (*Newberry Springs Water Assn.* v. *County of San Bernardino, supra,* at p. 750; *El Dorado Union High School Dist.* v. *City of Placerville* (1983) 144 Cal.App.3d 123, 130 [192 Cal.Rptr. 480].)

Nevertheless, if it is clear that considerable evidence was presented and that the evidence was not properly considered by the lead agency the reviewing court may find an abuse of discretion. (*No Oil, Inc.* v. *City of Los Angeles, supra,* 13 Cal.3d at p. 88; *Brentwood Assn. for No Drilling, Inc.* v. *City of Los Angeles, supra,* 134 Cal.App.3d at p. 505.)

In this case the record does not support defendants' contention that all of the public testimony and letters in the administrative record merely represent fears unsupported by any evidence. ▮ First, relevant personal observations are evidence. For example, an adjacent property owner may testify to traffic conditions based upon personal knowledge. Although even expert opinion may ultimately be rejected because of the expert's interest in the matter or for other reasons, an agency may not refuse to consider uncontradicted testimony based upon objective data. (See *Brentwood Assn. for No Drilling, Inc.* v. *City of Los Angeles, supra,* 134 Cal.App.3d at pp. 504-505.)

### 4. *Relevance of Public Controversy Standing Alone*

Plaintiffs contend that an EIR is required if a substantial public controversy exists. This position is not supported by case law. (See *No Oil, Inc.* v. *City of Los Angeles, supra,* 13 Cal.3d at pp. 85-86; *Newberry Springs Water Assn.* v. *County of San Bernardino, supra,* 150 Cal.App.3d at p. 749.) ▮ Moreover, the Legislature, by enacting Public Resources Code section 21082.2, made it clear that public controversy, absent substantial evidence of significant environmental effects, does not mandate preparation of an EIR. Upon remand, Public Resources Code section 21082.2 is the controlling authority.

### 5. *State Clearinghouse Filing Requirement*

▮ Plaintiffs contend that because Caltrans is a responsible agency it was mandatory that the lead agency file its negative declarations with the state Clearinghouse. For purposes of remand, we agree.

Plaintiffs failed to raise this issue at the administrative hearing. Nevertheless, because defendants must begin the environmental review process anew, some guidance in this area is appropriate.

The administrative guidelines of CEQA provide that "[w]here one or more state agencies will be a responsible agency or a trustee agency or will exercise jurisdiction by law over natural resources affected by the project, the lead agency shall send copies of the negative declaration to the State Clearinghouse for distribution to the state agencies." (Cal. Admin. Code, tit. 14, § 15073, subd. (c).) Not only does the State Clearinghouse distribute the negative declaration to the one or more responsible agencies, but also to "[r]eviewing agencies . . . selected for their expertise in particular subject matters or expressed interest in particular types of projects." (State Clearinghouse Handbook, Office of Planning and Research, Mar. 1984, at p. 4.) In addition, the Clearinghouse maintains and monitors computerized records on past and current development proposals. (*Id.,* at p. 5.) Major issues monitored by the state Clearinghouse that are pertinent here include project consistency with the appropriate local general plan, and planning objectives such as renewal and maintenance of existing urban areas, cumulative effects of projects, and secondary growth impacts of regional shopping centers. (*Id.,* at p. H-1.)

Despite its importance, the parties agree that the state Clearinghouse must be consulted in this case only if Caltrans is a responsible agency. The shopping center project is planned to be constructed adjacent to U.S. Route 395. The project application of Crumpler and Kruger, Inc. stated that the necessary encroachment permit would require Caltrans approval. The central question is thus whether Caltrans has "discretionary approval power over the project," the definition of responsible agency for the purposes of CEQA. (Cal. Admin. Code, tit. 14, § 15381.) Pursuant to Streets and Highways Code section 678, the county ". . . is entitled as a matter of right to a permit, but is otherwise subject to the provisions of this article and to all reasonable conditions and provisions made by the department in any such permit." This includes such "conditions as to the location and the manner in which the work is to be done as the department finds necessary for the protection of the highway." (Sts. & Hy. Code, § 672.)

Defendants contend that the county's entitlement to a permit as a matter of right necessarily means that Caltrans does not have "discretionary approval power." Defendants' contention ignores the definition provided in the administrative guidelines to CEQA: " 'Discretionary project' means a project which requires the exercise of judgment or deliberation when the public agency or body decides to approve or disapprove a particular activity,

as distinguished from situations where the public agency or body merely has to determine whether there has been conformity with applicable statutes, ordinances, or regulations." (Cal. Admin. Code, tit. 14, § 15357.) In contrast " '[m]inisterial' describes a governmental decision involving little or no personal judgment by the public official as to the wisdom or manner of carrying out the project." (*Id.*, at § 15369.) Therefore, because Caltrans can condition the right to an encroachment permit upon "the location and the manner" of the encroachment, its approval power is more discretionary than ministerial regardless of the right the county has to the permit as conditioned. (See *Johnson* v. *State of California* (1968) 69 Cal.2d 782, 788 [73 Cal.Rptr. 240, 447 P.2d 352].) This conclusion finds support in the holding by the Third District Court of Appeal that "doubt whether a project is ministerial or discretionary should be resolved in favor of the latter characterization." (*People* v. *Department of Housing & Community Dev.* (1975) 45 Cal.App.3d 185, 194 [119 Cal.Rptr. 266].)

## 6. *Inconsistency of Proposed Project With General Plan*

Plaintiffs contend that the proposed project, which they define as a "regionally-oriented shopping center," conflicts with the express policies and land use objectives of the Bishop general plan. Although there is merit in some of the concerns underlying plaintiffs' contention, we do not agree, as plaintiffs contend, that the alleged conflict with the general plan necessarily required the preparation of an EIR.

It is true that a project would normally be considered to have a significant effect on the environment if it conflicts with the adopted environmental plans and goals of the community where it is located. (Cal. Admin. Code, tit. 14, appen. G, subd. (a).) However, ". . . it does not necessarily follow that the Board's decision reclassifying the property . . . is inconsistent with the broad policy expressed in the general plan . . . ." (*Environmental Council* v. *Board of Supervisors* (1982) 135 Cal.App.3d 428, 440 [185 Cal.Rptr. 363].) Moreover, our view of such a claim must focus on whether the lead agency acted "arbitrarily, capriciously, or without any evidentiary basis." (*Id.*, at pp. 439-440; see *Karlson* v. *City of Camarillo* (1980) 100 Cal.App.3d 789, 801 [161 Cal.Rptr. 260].)

The broad objectives of the Bishop community plan (BCP) include (1) retaining and enhancing the downtown area as Bishop's commercial center and (2) encouraging clustering of convenient and mutually compatible commercial activities in desirable locations. It is the tension between these two objectives that is at the crux of whether the proposed shopping center on the outskirts of Bishop is consistent with the BCP. The BCP, anticipating

future population growth, provides for development of four outlying commercial centers, a regional-community center by 1990, two community-neighborhood centers, and a small neighborhood facility. The relatively large regional-community center, according to the BCP, ". . . should only be developed after a thorough economic-environmental analysis, including a (retail category) market analysis, has concluded that such a facility can successfully co-exist with a vital downtown central business district."

Plaintiffs characterize the proposed shopping center as a regional-community center that clashes with the BCP for want of an economic-environmental analysis. However, the proposed shopping center is best described as a hybrid or regional-community-neighborhood center, because it is smaller than the regional-community center, yet larger than the community-neighborhood centers described by the BCP. Moreover, the BCP only says that an economic-environmental analysis *should* be undertaken, not that it must be.

### ATTORNEYS' FEES

Plaintiffs contend that they are entitled to a reasonable award of attorneys' fees to the extent that their appeal has been successful. Plaintiffs have clearly established a colorable claim to an award of attorneys' fees pursuant to Code of Civil Procedure section 1021.5. We remand to the trial court for that court to determine the propriety of attorneys' fees after a hearing which focuses on the criteria established by section 1021.5.

Code of Civil Procedure section 1021.5 states in pertinent part that: "Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, [and] (b) the necessity and financial burden of private enforcement are such as to make the award appropriate, . . ." These criteria have been thoroughly discussed by the Supreme Court in *Woodland Hills Residents Assn., Inc.* v. *City Council* (1979) 23 Cal.3d 917, 934-942 [154 Cal.Rptr. 503, 593 P.2d 200], and its progeny.

Determining whether Code of Civil Procedure section 1021.5 is applicable, and if so, the amount of attorneys' fees that are reasonable, is generally left to the sound discretion of the trial court. (See *Woodland Hills Residents Assn., Inc.* v. *City Council, supra,* 23 Cal.3d at p. 941; *Serrano* v. *Priest* (1977) 20 Cal.3d 25, 49 [141 Cal.Rptr. 315, 569 P.2d 1303]; *Brennan* v.

*Board of Supervisors* (1984) 153 Cal.App.3d 193, 197 [200 Cal.Rptr. 192]; *Friends of "B" Street* v. *City of Hayward, supra,* 106 Cal.App.3d at p. 994; but see *Starbird* v. *County of San Benito* (1981) 122 Cal.App.3d 657, 665 [176 Cal.Rptr. 149].) "[R]eviewing courts are *not* 'in a position to decide the question [of propriety of attorney fees] in the first instance,' " the trial court is best suited for this task. (*Brennan* v. *Board of Supervisors, supra,* at p. 197, quoting *Woodland Hills Residents Assn., Inc.* v. *City Council, supra,* at p. 941.)

## DISPOSITION

The judgment is reversed with directions to the superior court to issue a peremptory writ of mandate directing respondent to set aside its orders of December 6, 1983 and March 6, 1984, adopting the negative declarations and related approvals. We also direct the superior court to grant any further relief that should prove appropriate, including the determination of and award of attorneys' fees.

McDaniel, J., and Rickles, J., concurred.