[No. C000810. Third Dist. Feb. 8, 1988.]

CITIZENS FOR QUALITY GROWTH et al, Plaintiffs and Appellants, v.
CITY OF MT. SHASTA et al., Defendants and Respondents;
C.D.M.S., INC., Real Party in Interest and Respondent.

436

**COUNSEL**

Remy & Thomas, Michael H. Remy and James G. Moose for Plaintiffs and Appellants.

John K. Van de Kamp, Attorney General, Andrea Sheridan Ordin, Chief Assistant Attorney General, Theodora Berger, Assistant Attorney General, Ken Alex and Clifford Rechtschaffen, Deputy Attorneys General, as Amici Curiae on behalf of Plaintiffs and Appellants.

David E. Otis, City Attorney, Orrick, Herrington & Sutcliffe, Gilbert R. Serota, Jennifer L. Machlin, Tomme R. Young for Defendants and for Respondents and for Real Party in Interest and Respondent.

**OPINION**

**CARR, J.**—In this action plaintiffs, an unincorporated nonprofit association composed of landowners, taxpayers and residents in and around Mt. Shasta, and one individual, challenge the actions of the City Council of Mt. Shasta (City) in the reclassification of a 35-acre parcel of land located within the City. After City amended its general plan and rezoned this tract of land, plaintiffs filed a petition for mandate, seeking an order compelling City to set aside its actions for failure to comply with the California

Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.). The trial court denied the petition. Plaintiffs appeal contending (1) City failed to comply with numerous procedural requirements of the CEQA,[1] (2) the trial court erred in refusing to tax costs, and (3) plaintiffs are entitled to attorneys' fees pursuant to Code of Civil Procedure section 1021.5.[2] The Attorney General's office on behalf of the people have, with permission, filed an amici curiae brief in support of plaintiffs.

For failure of City to follow CEQA requirements, we shall reverse with directions.

## FACTUAL AND PROCEDURAL BACKGROUND

Initially, a brief overview of CEQA is required. This legislation was and is a response to "a general and growing awareness and acceptance of the importance of the natural environment in the lives of [California] citizens, and the vital necessity of its protection and preservation." (*County of Inyo* v. *Yorty* (1973) 32 Cal.App.3d 795, 802 [108 Cal.Rptr. 377].) The Legislature found the preservation of a quality environment to be a matter of statewide concern (§ 21000, subd. (a)) and stated that all state agencies must give "major consideration" to preventing environmental damage when regulating activities affecting the quality of the environment. (*Id.,* subd. (g).) Among the enumerated policies of the state is the requirement that all governmental agencies "consider qualitative factors as well as economic and technical factors and long-term benefits and costs, in addition to short-term benefit and costs and . . . consider alternatives to proposed actions affecting the environment." (§ 21001, subd. (g).) To meet these goals, CEQA and its Guidelines (Cal. Admin. Code, tit. 14, § 15000 et seq. (hereinafter Guidelines)) outline a comprehensive scheme to evaluate potential adverse environmental effects.

If a project falls within the purview of CEQA, the agency must decide whether it has a significant effect on the environment, defined as "a

---

[1] All further statutory references are to the Public Resources Code unless otherwise indicated.

[2] Code of Civil Procedure section 1021.5 provides: "Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any. With respect to actions involving public entities, this section applies to allowances against, but not in favor of, public entities, and no claim shall be required to be filed therefor."

substantial, or potentially substantial, adverse change in the environment." (§ 21068.) If no such effects are predicted, the agency must file a "negative declaration" stating as much. If adverse effects are possible, the agency must prepare an environmental impact report (EIR). (Guidelines, § 15002, subd. (a)(1).)

"In many respects the EIR is the heart of CEQA. The report . . . may be viewed as an environmental 'alarm bell' whose purpose it is to alert the public and its responsible officials to environmental changes before they have reached ecological points of no return." (*County of Inyo* v. *Yorty, supra,* 32 Cal.App.3d at p. 810.) The EIR must "identify the significant effects of a project on the environment, . . . identify alternatives to the project, and . . . indicate the manner in which those significant effects can be mitigated or avoided." (§ 21002.1, subd. (a).)

After certifying the EIR as completed in compliance with CEQA (Guidelines, § 15090), the public agency may consider the project. However, it should not approve the project as proposed "if there are feasible alternatives or feasible mitigation measures available which would substantially lessen the significant environmental effects" of the project. (§ 21002.) The agency must make findings as set forth in section 21081. If the agency finds the mitigation measures or project alternatives infeasible, the agency must adopt a statement of overriding considerations, giving specific reasons to support its decision to proceed with the project. (Guidelines, § 15093.)

With this statutory scheme in mind, we turn to the case at bar.

The instant controversy centers around a 35-acre tract of land located in City near Interstate 5 and owned by real party in interest, C.D.M.S., Inc. The property is undeveloped and consists primarily of wetlands[3] marked by 12 mounds of peat soil and plant life. Under City's general plan, the land was designated as Central Business District and Medium Density Residential, with six acres zoned C-1, Central Business District, and the remainder unzoned.

In February 1984, City's planning commission (Commission) passed a resolution recommending the general plan be amended and the property

---

[3] The United States Army Corps of Engineers defines "wetlands" as "those areas that are inundated or saturated by surface or groundwater at a frequency and duration sufficient to support, and that under normal circumstances, do support a prevalence of vegetation typically adapted for life in saturated soil conditions. Wetlands are normally found in low-lying areas where the ground is inundated or saturated for at least a portion of the year. Typical plants in wetland areas in the Sacramento District include willow, alders, bulrushes, rushes, sedges, and cattails. Wetlands generally include swamps, marshes, bogs, wet meadows, and similar areas."

rezoned to permit commercial and controlled manufacturing uses. Commission also recommended a negative declaration be adopted on the basis that the proposed changes would have no significant environmental effects. Because of the public controversy engendered by Commission's resolutions, the City Council (Council) decided against a negative declaration and ordered an EIR prepared.

Public hearings were held and a final EIR was submitted to Council. The EIR identified 21 potential environmental impacts which might be reduced to an insignificant level with the adoption of specified mitigation measures. These effects included, inter alia, increased traffic congestion and soil erosion, degradation of air and water quality, increased health risks, and alteration of the site's visual character. The report outlined 35 possible mitigation measures[4] directed to the 21 potential impacts which could be mitigated, and identified one significant adverse impact that could not be mitigated: conversion of wetlands to urban use. Six alternatives to the proposed project were described, including "No Project" and "Development of the Non-wetland Area Only."[5]

Because the impact on the wetlands could not be mitigated, the adoption of a "Statement Of Overriding Considerations" by City was a prerequisite to approval of the project.

In October 1985, Council certified the EIR as complete and adopted a statement of overriding considerations concerning the loss of wetlands. Council then unanimously amended the general plan and rezoned the property to C-1 (Central Business District) and C-M (Controlled Manufacturing).

Plaintiffs filed a petition for mandate, contending City failed to follow CEQA procedures in making these changes. The trial court denied the petition finding substantial evidence supported City's decisions. This appeal followed.

---

[4] The transmittal letter for the EIR identified another five possible measures to be developed "as necessary to enhance the quality of site development, protect the City's fiscal integrity and the physical character of the community, and reduce the impact of the project on the existing central business district."

[5] Because of the public clamor caused by the proposed project and claims that the area in question did not contain wetland, a soils specialist was retained to investigate the site in question. It was determined that 64 percent of the area was wetland. The EIR set forth that "Wetland has been recognized by both state and federal governments as uniquely productive, of high resource value and in serious decline. As such, the wetland in this site should be preserved."

DISCUSSION

I

■ CEQA must be interpreted "to afford the fullest possible protection to the environment within the reasonable scope of the statutory language." (*Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247, 259 [104 Cal.Rptr. 761, 502 P.2d 1049]; reiterated in *Bozung* v. *Local Agency Formation Com.* (1975) 13 Cal.3d 263, 274 [118 Cal.Rptr. 249, 529 P.2d 1017].) "Any review of decisions made pursuant to CEQA or the Guidelines is governed by sections 21168 and 21168.5 of the Public Resources Code, the provisions of which focus such review on (1) whether there is any substantial evidence in light of the whole record to support the decision; and (2) whether the agency making the decision abused its discretion by failing to proceed in the manner required by law." (*Dehne* v. *County of Santa Clara* (1981) 115 Cal.App.3d 827, 835 [171 Cal.Rptr. 753].)

Plaintiffs urge the latter basis for reversal, asserting City failed to comply with several CEQA provisions. Specifically, they contend City (1) failed to make the requisite findings before approving the amendment and rezoning project and (2) gave an inadequate statement of overriding considerations by failing to address project alternatives. They also contend neither the EIR nor City adequately addressed the possible physical deterioration of the current business district as a result of the proposed rezoning. We consider each assertion in turn.

A.

■ As noted, a project may not be approved as proposed if feasible alternatives or mitigation measures would substantially lessen the project's significant environmental effect. (§ 21002.) Pursuant to this policy, section 21081 provides that "no public agency shall approve or carry out a project for which an environmental impact report has been completed which identifies one or more significant effects thereof unless such public agency makes one, or more, of the following findings: [¶] (a) Changes or alterations have been required in, or incorporated into, such project which mitigate or avoid the significant environmental effects thereof as identified in the completed environmental impact report. . . . [¶] (c) Specific economic, social, or other considerations make infeasible the mitigation measures or project alternatives identified in the environmental impact report." These findings must be made for *each* identified significant effect. (Guidelines, § 15091.)

The reasons for this procedural requirement were outlined in *Village Laguna of Laguna Beach, Inc.* v. *Board of Supervisors* (1982) 134

Cal.App.3d 1022 [185 Cal.Rptr. 41]. "[T]he purposes of section 21081 are that there be some evidence that the alternatives or mitigation measures in the EIR actually were considered by the decision making agency and, as the Supreme Court stated in a similar situation, that there be a disclosure of 'the analytic route the . . . agency traveled from evidence to action.' [Citations.] Thus, when a project is approved that will significantly affect the environment, CEQA places the burden on the approving agency to affirmatively show that it has considered the identified means of lessening or avoiding the project's significant effects and to explain its decision allowing those adverse changes to occur. [¶] The writing of a perfect EIR becomes a futile action if that EIR is not adequately considered by the public agency responsible for approving a project. Indeed, it is almost as if no EIR was prepared at all. . . . [¶] Additionally, even though the board may have fully considered the EIR and made a wise and eminently rational decision in approving the proposed project, the board's thinking process, its 'analytic route,' has not been revealed. Only by making this disclosure can others, be they courts or constituents, intelligently analyze the logic of the board's decision." (*Id.*, at pp. 1034-1035; accord, *Resource Defense Fund* v. *Local Agency Formation Com.* (1987) 191 Cal.App.3d 886, 896-898 [236 Cal.Rptr. 794], review den. July 29, 1987; see also *Cleary* v. *County of Stanislaus* (1981) 118 Cal.App.3d 348, 361-362 [173 Cal.Rptr. 390].)

 Plaintiffs assert City failed to make the requisite findings. This contention has merit.

The EIR identified 22 significant environmental effects for the proposed project, 21 of which could be mitigated. In certifying the EIR, Council noted the report addressed all agency and public comments and outlined mitigation measures addressing potential significant impact.[6] This remark was reiterated in Council's statement of overriding considerations, set forth in footnote 9, *infra*. However, Council did not expressly adopt these mitigation measures in findings as required by section 21081, subdivision (a). In fact, *no* findings were ever made.

City asserts its statements in the certification and statement of overriding considerations constitute an implicit finding adopting the mitigation mea-

---

[6]This resolution provided: "WHEREAS, a Draft Environmental Impact Report has been prepared to address a proposed General Plan Amendment and Zoning for the C.D.M.S. project; and [¶] WHEREAS, a public hearing was held on August 26, 1985 by the City Council of the City of Mt. Shasta to accept all public and agency comments; and [¶] WHEREAS, all agency and public comments have been addressed in 'Responses and Comments' dated October 11, 1985 of the Draft EIR; and [¶] WHEREAS, the Mitigation Measures outlined in the Draft E.I.R. address those impacts having the potential of being significant. [¶] Now, THEREFORE, BE IT RESOLVED by the City Council of the City of Mt. Shasta that the Draft Environmental Impact Report for the C.D.M.S. Project is certified as complete."

sures. We disagree. These passing references to the mitigation measures are insufficient to constitute a finding, as nothing in City's resolutions binds it to follow these measures.

City relies inter alia on *City of Poway* v. *City of San Diego* (1984) 155 Cal.App.3d 1037 [202 Cal.Rptr. 366], a case inapposite to the instant situation. In *Poway,* plaintiff contended San Diego made conclusionary and insufficient findings concerning significant environmental effects. (*Id.,* at pp. 1044-1047.) The problem in the instant case is not that City's findings are insufficient but that they are nonexistent.

The minutes of Council's meeting support this conclusion. Council members apparently believed adoption of the proposed mitigation measures was required only when a specific development plan was submitted. For example, the Mayor noted "that any options for the development of the site would be considered at the time the developer presented some type of developmental plan, then the options in the E.I.R. would be applied depending on the actual device is [*sic*]." Similarly, City argued to the trial court that it was not required to adopt any of the proposed mitigation measures until a specific developmental plan was proposed.[7] While detailed mitigation measures may not be possible before a specific development plan is proposed, general mitigation measures may be adopted and are in fact suggested in the EIR. (See *Christward Ministry* v. *Superior Court* (1986) 184 Cal.App.3d 180, 193-195 [228 Cal.Rptr. 868].)

 Section 21081 is clear: a public agency must incorporate the mitigation measures, or make other approved findings, before approving a proposed project with identified significant environmental impact. (*Cleary* v. *County of Stanislaus, supra,* 118 Cal.App.3d at p. 362.) While City addressed the one impact not susceptible to mitigation—the loss of wetlands—in its statement of overriding consideration, it did not expressly adopt or reject any of the proposed mitigation measures. This error compels reversal. (*Resource Defense Fund, supra,* 191 Cal.App.3d at pp. 897-898.)[8]

---

[7] The trial court apparently acted under the same erroneous belief. The statement of decision provides: "Petitioners contend that the City did not adequately provide for mitigation of potential significant environmental effects of the rezoning on the [Central Business District]. The Court finds this contention without merit, because substantial evidence in the record demonstrates that the City's approval incorporated the EIR's proposed mitigation measures as appropriate to future development."

On appeal, City no longer asserts adoption of mitigation measures may be postponed. Instead it contends mitigation measures were in fact adopted by reference in various resolutions. We therefore do not address the question of whether "delayed mitigation" is appropriate. We further assume for purposes of argument that City is not estopped from propounding this newly adopted view.

[8] The people contend City failed to consider one potentially feasible measure to mitigate the loss of wetlands: the restoration, creation or enhancement of an equivalent amount of wet-

## B.

We address plaintiffs' remaining contentions for the guidance of City and the trial court.

■ Plaintiffs assert City erred in failing to address alternatives to the proposed project before issuing its statement of overriding considerations. We agree.

The EIR opined that no mitigating measures were available to prevent the loss of wetlands caused by the proposed project. Again, City failed to make a finding concerning this impact as required by section 21081. It did, however, adopt a statement of overriding considerations asserting its justifications for proceeding with the project. While this statement, set forth in full in the margin,[9] discussed the advantages of the C.D.M.S. site, it made no mention of any of the six alternatives to the project outlined in the EIR,

---

lands. This policy, known as "adequate compensation" has been adopted by various state agencies; a similar measure was proposed when the draft EIR was circulated. The final EIR concluded this suggestion was simply "a statement of opinion; no response is required."

City asserts it is under no obligation to consider this mitigation measure because the Army Corps of Engineers will protect the wetlands to the fullest possible extent by refusing to issue a permit for any needlessly harmful development project. City cannot so avoid responsibility for its decision to amend the general plan and rezone the C.D.M.S. site. *Each* public agency is required to comply with CEQA and meet its responsibilities, including evaluating mitigation measures and project alternatives. (See Guidelines, § 15020.) Upon remand, by the superior court, therefore, City must give this proposal due consideration.

[9] This resolution provided: "WHEREAS, the CDMS site is located west of I-5 Freeway and north of Hatchery Lane; and [¶] WHEREAS, an Environmental Impact Report (E.I.R.) prepared for the General Plan Amendment and Zoning for the site states that a majority of the site is wetlands; and [¶] WHEREAS, the displacement of the wetlands, considered a significant impact by the E.I.R., cannot be mitigated, which requires a Statement of Overriding Considerations. [¶] Now, THEREFORE, the City Council of the City of Mt. Shasta makes the following findings in justification of a Statement of Overriding Considerations: [¶] WHEREAS, the project site: [¶] Does not qualify as prime agricultural land; Possesses no rare or endangered wildlife; Supports no rare or endangered plant species and; Has no known archeological significance; and [¶] WHEREAS, the E.I.R. adequately sets forth mitigation measures addressing all other known potential impacts except the wetlands issue; and [¶] WHEREAS, the E.I.R. indicates the Greenhorn soils areas shown in the City's Master Environmental Assessment are, while not field checked, assumed to be wetlands; and [¶] WHEREAS, a long standing policy has been to allow normal community development upon such areas namely; Mt. Shasta Community Hospital, Mt. Shasta Shopping Center, East Lake Street Commercial Area, etc.; and [¶] WHEREAS, a change in that policy would be precedential and limit development within our community; and [¶] WHEREAS, the Greenhorn soils are not confined within the city limits, but extend southerly beyond the total Growth Inducement Area as noted in the E.I.R.; and [¶] WHEREAS, the CDMS site, located at the central entry to Mt. Shasta and highly visible from the surrounding areas, offers a unique location for potential growth of the city's economy. [¶] Now, THEREFORE, BE IT RESOLVED that the City Council of the City of Mt. Shasta hereby approves this Statement of Overriding Considerations as justification for development of the wetlands within the CDMS site."

i.e., (1) no project, (2) development of the nonwetland area only, (3) residential use, (4) alternate project design, (5) periodic land use inventory review and promotion of infill, and (6) option design. Alternatives 1 and 2 were labelled "environmentally superior alternatives."

Section 21081, subdivision (c), permits an agency to find "[s]pecific economic, social, or other considerations make infeasible the mitigation measures or project alternatives identified in the environmental impact report." (See also Guidelines, § 15091, subd. (b).) City contends the use of the disjunctive in this provision ("makes infeasible the mitigation measures *or* project alternatives") authorizes an agency to rely on either overriding considerations or the infeasibility or project alternatives. In other words, if unmitigated effects are justified by overriding considerations, the agency may approve the project without analyzing the feasibility of alternatives. City's argument is flawed in several respects.

Section 21081 and Guidelines section 15091 require an agency to make findings for *each* significant environmental effect. Loss of wetlands was one such impact, for which no mitigation measures were proposed. At least two of the alternatives identified, however, bore on this issue: no project and development of nonwetland area only. Given these suggested alternatives and the complete dearth of possible mitigation measures for the wetlands, City was required to find "[s]pecific economic, social, or other considerations make infeasible the . . . project alternatives identified in the final [environmental impact report]." (Guidelines, § 15091, subd. (a) (3).) It did not do so, and instead simply issued a statement of overriding considerations.

City relies on *Laurel Hills Homeowners Assn.* v. *City Council* (1978) 83 Cal.App.3d 515 [147 Cal.Rptr. 842]. In *Laurel Hills,* a developer sought approval for a 124-lot subdivision for single family homes. An EIR was prepared identifying various mitigation measures and alternative projects, including one for a 63-unit condominium project. The City reduced the subdivision to 94 lots and adopted the mitigation measure without making any findings concerning the alternative projects.

The court upheld the decision, finding the City was not required to find the alternative project infeasible. "As we see it, the fundamental purpose of CEQA is to prevent avoidable damage to the environment from projects. [Citations.] If this end can be accomplished essentially by the imposition of feasible mitigation measures alone, there is no need to resort to a consideration of the feasibility of environmentally superior project alternatives identified in the environmental impact report. This apparently is the reason why

(aside from their joint inclusion in environmental impact reports) mitigation measures and project alternatives are always mentioned together in the alternative rather than in the conjunctive . . . . Otherwise the fundamental purpose of CEQA would become the mandatory choice of the environmentally best feasible project. We believe . . . the appropriate public agency may approve a developer's choice of a project once its significant adverse environmental effects have been reduced to an acceptable level—that is, all avoidable significant damage to the environment has been eliminated and that which remains is otherwise acceptable. In other words, CEQA does not mandate the choice of the environmentally best feasible project if through the imposition of feasible mitigation measures alone the appropriate public agency has reduced the environmental damage from a project to an acceptable level." (*Id.,* at p. 521.)

*Laurel Hills* is inapposite to the instant case. This is not a situation in which the imposition of feasible mitigation measures alone can prevent avoidable environmental damage: *no* mitigation measures were proposed to prevent loss of wetlands. City was therefore required to weigh the feasibility of the identified alternative projects.[10] (See also *Village Laguna, supra,* 134 Cal.App.3d at pp. 1033-1034.) In its brief, City offers numerous reasons why these alternatives are unworkable. As plaintiffs point out, these issues should have been addressed before the project was approved, not offered as post hoc justifications.

### C.

■ Finally, plaintiffs assert City erred in failing to consider the potential physical effect of the rezoning on the central business area. The EIR pointed out the proposed project may pose a significant economic problem for existing businesses, but offered little analysis of the issue, noting the economic effects of the project were beyond the scope of CEQA.

Guidelines section 15064 mandates that both primary (direct) and secondary (indirect) consequences be considered in determining the significance of a project's environmental effect. (Subd. (d).) The regulation also provides: "Economic and social changes resulting from a project shall not

[10] *Laurel Hills, supra,* has been criticized as misapplying the fundamental precept of CEQA as outlined in *Friends of Mammoth, supra,* by failing to interpret CEQA to provide the fullest possible protection to the environment within the reasonable scope of the statute's language. (Selmi, *The Judicial Development of the California Environmental Quality Act* (1984) 18 U.C. Davis L.Rev. 197, 263-265.) Under *Laurel Hills,* a project could be approved even when the mitigation measures had a greater adverse environmental impact than a feasible alternative. (*Ibid.*) Because we find *Laurel Hills* inapposite to the instant case, we offer no opinion as to its holdings.

be treated as significant effects on the environment. Economic or social changes may be used, however, to determine that a physical change shall be regarded as a significant effect on the environment. Where a physical change is caused by economic or social effects of a project, the physical change may be regarded as a significant effect in the same manner as any other physical change resulting from the project. Alternatively, economic and social effects of a physical change may be used to determine that the physical change is a significant effect on the environment . . . ." (Subd. (f).)

Plaintiffs assert that although the EIR noted possible economic harm to the existing business community from the proposed project, City failed to consider how those economic problems might translate into physical environmental changes. City contends, and the trial court agreed, that no analysis of economic effects was required in the EIR.

An identical dispute was raised in *Citizens Assn. for Sensible Development of Bishop Area* v. *County of Inyo* (1985) 172 Cal.App.3d 151, 169-170 [217 Cal.Rptr. 893], in which the court held subdivisions (d) and (f) of Guidelines, section 15064, may be interpreted consistently by construing the provisions to mean "the lead agency *shall* consider the secondary or indirect environmental consequences of economic and social changes, but *may* find them to be insignificant. Such an interpretation is unequivocally consistent with the mandate that secondary consequences of projects be considered." (*Id.,* at p. 170.) The court further noted that subdivision (f) "expressly gives the agency discretion to determine whether the consequences of economic and social changes are significant, which is not the same as discretion to not consider these consequences at all." (*Ibid.*)

The potential economic problems caused by the proposed project could conceivably result in business closures and physical deterioration of the downtown area. Therefore, on remand, City should consider these problems to the extent that potential is demonstrated to be an indirect environmental effect of the proposed project.

In summary, City failed to make findings adopting or rejecting the proposed mitigation measures for the environmental impacts identified by the EIR. It also failed to evaluate the proposed alternatives before adopting its statement of overriding considerations, or to consider the possible physical deterioration of the downtown area resulting from the project. We must therefore reverse the judgment.

## II

Plaintiffs contend the trial court erred in denying their motion to tax costs. Under section 21167.6,[11] plaintiffs had the option of preparing the administrative record themselves to minimize expenses.

City's costs bill for preparation of the administrative record is itemized as follows:

> "a. Documents Retrieval and Copying
>
> "(i) Administrative time $ 136.32
>
> "(ii) Photocopying 279.90
>
> "b. Organizing and Indexing 3,727.50
>
> "c. Duplicating and Binding 394.35
>
> "TOTAL COST OF ADMINISTRATIVE RECORD $4,538.07"

Plaintiffs' motion to tax costs was based on two grounds: (1) that City thwarted plaintiffs' statutory right under section 21167.6, subdivision (b), to elect to prepare the administrative record themselves by refusing to respond to their request for an estimate of the cost to have the record prepared by City, and (2) some of the costs included in the preparation of this record related to the preparation of the case for the benefit of City and its attorneys and was not a proper or reasonable charge. This challenge was apparently directed at the organizing and indexing charge.

In response to the motion, City filed a declaration by an attorney from the private firm hired to represent City in this litigation, Tomme R. Young. Ms. Young averred that City had insufficient employees to prepare the record within the time parameters for filing the record; therefore, the organizing and indexing of documents was done by one paralegal and one clerk from the private law firm at $65 per hour and $35 per hour respectively for

---

[11] Section 21167.6, subdivision (b) provides in relevant part: "The public agency shall prepare and certify the record of proceedings not later than 60 days after the request . . . is served upon the public agency. The parties shall pay any costs or fees imposed for the preparation of the record of proceedings in conformance with any law or rule of court. The petitioner may elect to prepare the record of proceedings or the parties may agree to an alternative method of preparation of the record of proceedings, subject to certification of its accuracy by the public agency, within the time limit specified in this subdivision."

a total of 45.5 paralegal hours and 22 hours clerk time. The administrative time spent by City employees was 16 hours at $8.52 an hour.

In ruling on the motion, the trial court found the cost of preparation was necessarily incurred and that petitioners did not elect pursuant to section 21167.6, subdivision (b) to prepare the record. This ruling does not determine all the issues tendered by the motion to tax. The trial court did not determine the costs of preparation were reasonable.

The charge for City employees' time was $8.52 per hour; the charge for the clerk provided by City's attorneys was $35 per hour.[12] Pursuant to section 21167.6, subdivision (b), City was charged with the preparation of the record absent a valid election by plaintiffs to undertake such preparation. It appears from the charges made by City that its employee input cost $8.52 per hour, presumably the regular rate paid to such employees. The cost of 67½ hours to organize and index the record by employees of City results in a cost of $574.90 for such work, as opposed to the $3,727.50 paid to a $65 per hour paralegal and a $35 per hour clerk. If it is claimed the record preparation was accelerated by the employment of persons expert in this work, the trial court, in the absence of a prior order fixing compensation, should have determined if it was necessary for City to employ such experts and whether the cost thereof was reasonable. On remand, the trial court is directed to make this determination.

### III

Finally, plaintiffs seek attorneys' fees under Code of Civil Procedure section 1021.5, asserting their actions have conferred a benefit on the general public. ■ While plaintiffs may have established a colorable claim to attorneys' fees by virtue of their success on appeal, the determination whether Code of Civil Procedure section 1021.5 is applicable, and if so, the appropriate amount of attorneys' fees that are reasonable, is best left to the sound discretion of the trial court in this instance. (*Citizens Assn., supra,* 172 Cal.App.3d at p. 176.)

### DISPOSITION

The judgment is reversed with directions to the superior court to issue a peremptory writ of mandate directing City to set aside its resolutions adopting the amendment to the general plan and the zoning change of the

---

[12] The message here appears to be that it is more financially rewarding to work for a San Francisco law firm than the City of Mt. Shasta.

C.D.M.S. site and on any further proceedings on the EIR, the general plan amendment and zoning change at issue herein to make the necessary findings as set forth in this opinion. The trial court is further directed to grant any further appropriate relief. Plaintiffs shall recover costs on appeal.

Evans, Acting P. J., and Sims, J., concurred.