[No. F055024. Fifth Dist. Mar. 24, 2010.]

PATRICIA MELOM, Plaintiff and Appellant, v.
CITY OF MADERA, Defendant and Respondent;
ZELMAN RETAIL PARTNERS, INC., Real Party in Interest and
Respondent.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II.

COUNSEL

M. R. Wolfe & Associates and Mark R. Wolfe for Plaintiff and Appellant.

Richard K. Denhalter, City Attorney, and J. Brent Richardson, Deputy City Attorney, for Defendant and Respondent.

Sheppard Mullin Richter & Hampton and Philip F. Atkins-Pattenson for Real Party in Interest and Respondent.

OPINION

**ARDAIZ, P. J.**—Appellant contends that the City of Madera (City) violated the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.) and the City's municipal code by approving a commercial retail shopping center project without preparing a subsequent or supplemental environmental impact report (EIR) for the project after the site plan for the 795,000 square feet of retail space in the project was changed so that the largest retail space grew from 138,000 square feet to 198,484 square feet. As we shall explain, we agree with the superior court that neither CEQA nor the municipal code was violated.

Appellant's CEQA argument relies heavily on this court's opinion in *Bakersfield Citizens for Local Control v. City of Bakersfield* (2004) 124 Cal.App.4th 1184 [22 Cal.Rptr.3d 203] (*Bakersfield Citizens*). In the published portion of our decision, we clarify that *Bakersfield Citizens* did not hold and should not be construed as holding that the inclusion in a project of a retail store called a "supercenter" necessarily triggers a requirement that the project's EIR include an examination of possible urban decay effects.

## FACTS

In November of 2006 the City certified an EIR for a project described in the EIR as a "proposed retail center" with "approximately 795,000 square feet of gross floor area located on a 100-acre site" located just northeast of the intersection of State Highway 99 and Avenue 17. A "conceptual site plan" in the EIR showed approximately 30 retail spaces, the largest of which (labeled "Major 7") was 125,000 square feet. Because the 100-acre site was located north of and just outside of the city limits, it first had to be annexed to the City. The annexation was approved on February 13, 2007. On or about March 29, 2007, the developer submitted what it describes as a "refined" site plan to the City's community development director (CDD) for administrative review. The largest retail space in the refined site plan was considerably

larger than the one that had appeared in the "conceptual" site plan in the EIR. The largest retail space in the refined site plan was labeled "Major A" and described as 198,484 square feet "not including garden center." The garden center adjoining the Major A space on the refined site plan was an additional 10,900 square feet. The refined site plan identified the proposed Major A tenant as a "Super Target" store. The total retail square footage of the entire project (approximately 795,000) remained unchanged.

On May 4, 2007, the CDD approved the developer's refined site plan. In June of 2007 the City prepared an "Addendum" to the EIR, which concluded that "there are no substantial changes proposed in the Project which would require major revisions of the previous EIR due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified significant effects." At a July 10, 2007 meeting of the City planning commission (Commission), the Commission voted unanimously to recommend that the City approve a development agreement with the developer for the project. The City's "staff report" to the Commission in preparation for the Commission's July 10 meeting had recommended adoption of the resolution recommending that the City adopt the proposed development agreement. That staff report also stated in part: "An environmental impact report (EIR) was certified for the overall project in December of 2006. An addendum to the EIR has been prepared to address refinements to the conceptual site plan which was referenced in the initial EIR. The addendum must be considered in conjunction with the proposed development agreement." The staff's report also stated: "The EIR Addendum appropriately addresses clarifications made to the project since the original EIR was certified. No new impacts have been identified. Staff recommends approval of the development agreement." At the July 10 meeting, the City's CDD explained the purpose of the Addendum and explained that the commissioners must consider the Addendum in conjunction with any decision they make:

"You see the previous plan had on the west side had one large [store] about 125,000 square feet. Kind of in the middle of the site plan had another larger format of about 138,000.

"But the inside plan has one very large store just under 200,000 square feet. And the other tenant sizes are reduced somewhat to make up for it. That's the principal change that we covered in the addendum. Some of the tenants squished here and expanded there, but none were particularly noteworthy.

"The EIR addendum covers the fact that there's no increase in the total building area. So previously we had a max of 795,000 square feet. But the max identified here is actually a little bit less, 791,000 square feet in change.

And finally to the addendum, EIR identifies no changes to the significance of any impacts or the presents [*sic*] of any new impact.

"The responsibility of the decision-makers is to review and consider the addendum in conjunction with your decision. So that is essentially what you will be doing with any action that you take.

"And with that, I would be happy to answer any questions."

The meeting chairperson asked "Any questions?" None were asked. Several persons at the meeting spoke in favor of adopting the development agreement. No one spoke against it, or against the adequacy of the environmental review in the Addendum.

At an August 1, 2007 city council meeting, the City adopted a resolution approving the Addendum to the previously certified EIR, and adopted an ordinance approving and adopting the development agreement between the City and the developer. The vote was four in favor, one against. At this meeting the City's CDD again gave an explanation of the Addendum similar to the one he had given at the July 10 Commission meeting. He explained that "[t]he principal change is that there is one big building at 198,000 square feet" that the "addendum concludes that there are no changes to the significance of any impacts or the presence of any new impact generated by that refinement and square footages," and that "there's no net increase in total building area, no changes in use." At the conclusion of the CDD's presentation, the meeting chairman, Mayor Mindt, asked if there were any questions for the CDD. None were asked. No one spoke against the resolution approving the Addendum. The only person who spoke against the ordinance approving and adopting the development agreement was Councilmember Sam Armentrout, who explained "[m]y concerns are the amount of infrastructure costs that the City is willing to pay back to get this project here and the fact that the developer has the right to assign or sell the agreement in the future." Although Councilmember Armentrout's dissatisfaction was with the development agreement and not with the Addendum, the Addendum resolution and the development agreement ordinance were voted on as a package, and thus Armentrout's no vote was cast on both of those agenda items.

The present action was filed on August 1, 2007, the same day the city council approved the Addendum to the EIR and the ordinance approving and adopting the development agreement, but before the city council held its meeting. The action alleged that the City's revision of the site plan to expand the 125,000 square foot space (Major 7) in the original site plan to a 198,484 square foot space (Major A) in the revised site plan without first preparing a subsequent or supplemental EIR violated CEQA and various provisions of the

Madera Municipal Code. The superior court disagreed, and denied appellant Patricia Melom's petition for a writ of mandate directing the City to set aside its May 4, 2007 approval of the revised site plan.

## APPELLANT'S CONTENTIONS

Appellant contends that (1) the City violated CEQA, and particularly Public Resources Code section 21166,[1] when it approved the revised site plan without first preparing a subsequent or supplemental EIR, and (2) the City's approval of the revised site plan violated section 10-3.4.0106 of the Madera Municipal Code. Appellant's contentions appear to be based in large part on appellant's reading of this court's decision in *Bakersfield Citizens, supra,* 124 Cal.App.4th 1184, and her reading of the later case of *American Canyon Community United for Responsible Growth v. City of American Canyon* (2006) 145 Cal.App.4th 1062 [52 Cal.Rptr.3d 312] (*American Canyon*). Appellant appears to view these decisions as requiring that whenever a governmental entity approves a project which includes a so-called supercenter (such as the "Super Target" which is part of the present project), approval of such a project requires an EIR addressing "potential urban decay effects" which might result from the supercenter. As we shall explain, we do not so read these two cases. We will affirm the judgment.

### I.

### CEQA

A. *Standard of Review*

"In reviewing an agency's compliance with CEQA in the course of its legislative or quasi-legislative actions, the courts' inquiry 'shall extend only to whether there was a prejudicial abuse of discretion.' (Pub. Resources Code, § 21168.5.) Such an abuse is established 'if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.' (§ 21168.5; see *Western States Petroleum Assn. v. Superior Court* [(1995)] 9 Cal.4th [559,] 568 [38 Cal.Rptr.2d 139, 888 P.2d 1268]; *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 392–393 [253 Cal.Rptr. 426, 764 P.2d 278] . . . .)

"An appellate court's review of the administrative record for legal error and substantial evidence in a CEQA case, as in other mandamus cases, is the same as the trial court's: The appellate court reviews the agency's action, not

---

[1] All further statutory references are to the Public Resources Code unless otherwise stated.

the trial court's decision; in that sense appellate judicial review under CEQA is de novo. [Citations.] We therefore resolve the substantive CEQA issues . . . by independently determining whether the administrative record demonstrates any legal error by the [Agency] and whether it contains substantial evidence to support the [Agency's] factual determinations." (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 426–427 [53 Cal.Rptr.3d 821, 150 P.3d 709], fns. omitted.)

### B.   *There Was No Violation of Section 21166*

Appellant contends that the City's approval of the refined site plan violated section 21166. We disagree. That section states:

"When an environmental impact report has been prepared for a project pursuant to this division, no subsequent or supplemental environmental impact report shall be required by the lead agency or by any responsible agency, unless one or more of the following events occurs:

"(a) Substantial changes are proposed in the project which will require major revisions of the environmental impact report.

"(b) Substantial changes occur with respect to the circumstances under which the project is being undertaken which will require major revisions in the environmental impact report.

"(c) New information, which was not known and could not have been known at the time the environmental impact report was certified as complete, becomes available." (§ 21166.)

As case law has stated with regard to the purpose and application of section 21166:

"Public Resources code section 21166 provides that, when environmental review has been performed, no subsequent or supplemental EIR shall be required by the lead agency or any responsible agency unless (1) substantial changes are proposed in the project that will require major revisions of the EIR, or (2) substantial changes occur with respect to the circumstances under which the project will be undertaken that will require major revisions in the EIR, or (3) new information, which was not known and could not have been known when the EIR was certified, becomes available.

"This provision represents a shift in the applicable policy considerations. The low threshold for requiring the preparation of an EIR in the first instance is no longer applicable; instead, agencies are prohibited from requiring

further environmental review unless the stated conditions are met. (*Fund for Environmental Defense v. County of Orange* (1988) 204 Cal.App.3d 1538, 1544 [252 Cal.Rptr. 79].)

"Thus, Public Resources Code section 21166 provides a balance against the burdens created by the environmental review process and accords a reasonable measure of finality and certainty to the results achieved. [Citation.] At this point, the interests of finality are favored over the policy of favoring public comment, and the rule applies even if the initial review is discovered to have been inaccurate and misleading in the description of a significant effect or the severity of its consequences. (*Laurel Heights Improvement Assn. v. Regents of University of California, supra,* 6 Cal.4th at p. 1130.)" (*Friends of Davis v. City of Davis* (2000) 83 Cal.App.4th 1004, 1017–1018 [100 Cal.Rptr.2d 413], fn. omitted.)

■ "[S]ection 21166 comes into play precisely because in-depth review has already occurred, the time for challenging the sufficiency of the original EIR has long since expired (§ 21167, subd. (c)), and the question is whether circumstances have *changed* enough to justify *repeating* a substantial portion of the process." (*Bowman v. City of Petaluma* (1986) 185 Cal.App.3d 1065, 1073–1074 [230 Cal.Rptr. 413].)

■ Appellant points to no evidence in the administrative record of any potential urban decay effects which might result from approval of the project with the revised site plan. Rather, appellant relies on *Bakersfield Citizens, supra,* 124 Cal.App.4th 1184, and *American Canyon, supra,* 145 Cal.App.4th 1062, for the proposition that the addition of a so-called supercenter to the project automatically requires an analysis of potential urban decay effects which might result from approval of a project which includes such a supercenter. Neither of those cases supports that proposition.

*Bakersfield Citizens* did not address any section 21166 issue at all. It addressed the legal sufficiency of EIR's prepared and certified for two shopping center projects. (*Bakersfield Citizens, supra,* 124 Cal.App.4th at p. 1193.) This court stated in *Bakersfield Citizens*: "[P]roposed new shopping centers do not trigger a conclusive presumption of urban decay. However, when there is evidence suggesting that the economic and social effects caused by the proposed shopping center ultimately could result in urban decay or deterioration, then the lead agency is obligated to assess this indirect impact." (*Id.* at p. 1207.) The *Bakersfield Citizens* case pointed out that there was such evidence, and that "[t]he lead agency cannot divest itself of its analytical and informational obligations by summarily dismissing the possibility of urban decay or deterioration as a 'social or economic effect' of the project." (*Ibid.*) In fact, in *Bakersfield Citizens* a "professor of economics" conducted a

"study" and prepared a "report" that "identified 29 businesses, primarily but not exclusively grocery stores, that are at direct risk of closure." (*Id.* at p. 1209.) The professor's report is described in detail at page 1209 of the *Bakersfield Citizens* decision, including his conclusions that smaller retailers may go out of business, that this in turn may cause permanent or long-term vacancies of retail space in the area, resulting in neglect of maintenance of vacant facilities and " 'physical effects associated with blight-like conditions, which include visual and aesthetic impacts accompanying the physical deterioration.' " (*Ibid.*)

Appellant also calls our attention to a portion of the *Bakersfield Citizens* decision stating: "BCLC also submitted numerous studies and articles analyzing the adverse effects other communities in California (San Diego, Orange County and Calexico,) and elsewhere (Oklahoma City, Oklahoma; Bath, Maine; Eastern Pennsylvania; Chicago, Illinois; Syracuse, New York) have experienced as a result of saturation of a market area with super-sized retailers. As relevant here, the authors found numerous adverse effects resulting from saturation of a market area with Supercenters and similar retail facilities, such as SuperTargets and SuperKmarts. These effects include, but are not limited to, physical decay and deterioration resulting from store closures in the same market area or in established areas of the community (i.e., the 'traditional downtown area') due to competitive pressures, followed by an inability to easily re-lease the vacated premises." (*Bakersfield Citizens, supra,* 124 Cal.App.4th at pp. 1209–1210, fn. omitted.)

No such study was presented to the City in the case presently before us. Even if such a study had been presented, appellant points to no evidence of any "saturation of [the] market area with super-sized retailers" (*Bakersfield Citizens, supra,* 124 Cal.App.4th at p. 1210, fn. omitted) which might conceivably make such a study relevant to this project.

We find appellant's reliance on *American Canyon, supra,* 145 Cal.App.4th 1062, to be similarly unavailing. Nothing in *American Canyon* holds or even implies that approval of a project which includes a supercenter must necessarily include an analysis of potential urban decay effects. In *American Canyon* a city adopted a mitigated negative declaration (MND) for a two-phase project and approved the project in December of 2003. Each phase was approximately 20 acres in size. Phase one consisted of a hotel, multifamily housing, and approximately 32,000 square feet of retail space. Phase two added "about 165,000 square feet of retail space in various size buildings and pad sites on the northern half of the property." (*Id.* at p. 1067.) "In July and August of 2004, Wal-Mart applied for a design permit and a sign program for the proposed construction of a Wal-Mart supercenter in the phase two area of the Project. The proposed supercenter would operate seven days a week, 24

hours a day and would include a full-service grocery department in addition to a general merchandise department." (*Id.* at p. 1068.) After a public hearing before the city's planning commission and "public hearings" held by the city council, "the city council approved the design permit application and sign program" and "issued a notice of determination that the Project would not have a significant effect on the environment." (*Id.* at p. 1069.) In making its decision the city council had before it an "expert's study of the economic effects of the supercenter, which included regional store closures that could lead to urban decay." (*Id.* at p. 1068.) Superior court petitions alleging CEQA violations were denied.

The Court of Appeal in *American Canyon* reversed the superior court's decision. The Court of Appeal stated: "We conclude that the City prejudicially violated CEQA. First, the City unreasonably minimized the size increase in the phase two retail component. That error fatally undermined the validity of the City's updated traffic analysis. The City's determination that the project changes would not substantially increase the project's impact on traffic is not supported by substantial evidence. Second, the City failed to proceed as required by law when it refused to consider the extraterritorial effects of the proposed supercenter, specifically the urban decay effects that might result from store closures in neighboring cities caused by economic competition from the supercenter." (*American Canyon, supra,* 145 Cal.App.4th at pp. 1066–1067.) With regard to the first of these two conclusions, the opinion points out that the city attempted to justify its conclusion that there were no substantial changes to the project by describing the 193,954 square foot Wal-Mart as including " '154,074 square feet of commercial uses (*excluding the stockroom, employee use area and seasonal events sales area*).' " (*Id.* at p. 1076.) This enabled the city to conclude that the Wal-Mart was " 'consistent with the 196,000 square feet evaluated by the [MND]' " (*ibid.*), even though in fact the 193,954 square foot Wal-Mart, along with the 37,930 square feet of phase one commercial uses, would exceed 230,000 square feet and thus would be far in excess of the 196,000 square feet of retail space evaluated by the MND. The opinion further explained that this "low calculation of the supercenter's square footage fatally undermines its conclusion that the supercenter proposal would have no significant effects on traffic requiring supplemental environmental review." (*Id.* at p. 1078, fn. omitted.) With regard to potential urban decay, the opinion noted that there was nothing in the administrative record to counter the expert's opinion that the supercenter would likely lead to urban decay. (*Id.* at pp. 1082–1083.)

The case presently before us presents neither of these two flaws. There was no misdescription of the size of the project, and no expert evidence or any other evidence that approval of the project with the refined site plan might lead to urban decay.

Appellant calls our attention to a portion of the *American Canyon* decision which states "[t]his project change is comparable to the project changes held to be subject to section 21166 in several appellate court decisions . . ." and "Section 21166 applies to the project change." (*American Canyon, supra,* 145 Cal.App.4th at p. 1073.) These statements were not, as appellant appears to imply, statements that one of the triggering events described in section 21166 as requiring a subsequent or supplemental EIR had in fact occurred. Rather, the court was stating that the change had to be evaluated under section 21166 to determine whether it was or was not one of the triggering events described in that section. The court's statements were made in the context of its rejection of an argument that "the project is not subject to section 21166 because the supercenter proposal was essentially a new project, not a change in the original Project." (*American Canyon, supra,* 145 Cal.App.4th at pp. 1072–1073.)

Finally, appellant relies on language in the *American Canyon* decision stating: "A supercenter is a unique type of retail operation. 'When the particular type of retail business planned for a proposed project will have unique or additional adverse impacts, then disclosure of the type of business is necessary in order to accurately recognize and analyze the environmental effects that will result from the proposed project. A rendering plant has different environmental impacts than a chandler. In the retail context, Supercenters are similarly unique. Unlike the vast majority of stores, many Supercenters operate 24 hours per day seven days a week. Such extended operational hours raise questions concerning increased or additional adverse impacts relating to lights, noise, traffic and crime.' [Citation.] There is also evidence in the record that supercenters draw from a larger regional market than more typical shopping centers with the same total square footage of retail space and thus may have unique traffic impacts." (*American Canyon, supra,* 145 Cal.App.4th at p. 1075.)

In the case before us, however, the evidence was undisputed that operations of the retail and restaurant establishments at the Madera town center "are to adhere to normal hours for retail/restaurant establishments in Madera County." Nor was there any evidence that the project with the revised site plan would have unique traffic impacts.

### C. *Clarification of* Bakersfield Citizens

We note that while both *Bakersfield Citizens* and *American Canyon* repeatedly use the term "supercenter" or "supercenters" (see *Bakersfield Citizens, supra,* 124 Cal.App.4th at pp. 1208–1215; *American Canyon, supra,* 145 Cal.App.4th at pp. 1066–1069, 1073–1075, 1077–1084), that term is not defined anywhere in those cases or in any statute or guideline. *Bakersfield*

*Citizens* states "many Supercenters operate 24 hours per day seven days a week." (*Bakersfield Citizens, supra,* 124 Cal.App.4th at p. 1213.) Thus apparently not all supercenters are 24 hours per day businesses. *American Canyon* makes reference to a "supercenter that combined a big-box discount store and a full grocery store." (*American Canyon, supra,* 145 Cal.App.4th at p. 1066.) *American Canyon* does not expressly say that a supercenter is a retail business that combines a "big-box discount store" and a "full grocery store," but even if it did, the terms "big-box discount store" and "full grocery store" themselves remain undefined. These cases also talk about the square footage of supercenters, but if there is a minimum amount of square footage required for a retail establishment to qualify as a supercenter, neither the *Bakersfield Citizens* and *American Canyon* cases say what that minimum square footage requirement is.

■ In *Bakersfield Citizens* we stated "Supercenters are . . . unique." (*Bakersfield Citizens, supra,* 124 Cal.App.4th at p. 1213.) *American Canyon* quoted this language from *Bakersfield Citizens* (see *American Canyon,* 145 Cal.App.4th at p. 1075) and stated "A supercenter is a unique type of retail operation." (*Ibid.*) Arguably, however, any type of retail operation is unique, just as "[a] rendering plant has different environmental impacts than a chandler." (*Bakersfield Citizens, supra,* 124 Cal.App.4th at p. 1213.) For purposes of CEQA, the significant inquiry is whether an agency proposes or intends to carry out or approve a "project" which "may have a significant effect on the environment." (§§ 21100, subd. (a), 21151, subd. (a).) Under those circumstances, the agency "shall prepare, or cause to be prepared . . . , an environmental impact report" for that project. (§ 21100, subd. (a); accord, *Schellinger Brothers v. City of Sebastopol* (2009) 179 Cal.App.4th 1245, 1257 [102 Cal.Rptr.3d 394].) When, as here, an EIR has already been prepared and certified, and there is a change in the project, the question becomes whether "[s]ubstantial changes are proposed in the project which will require major revisions of the previous EIR . . . due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified significant effects . . . ." (Cal. Code Regs., tit. 14, § 15162, subd. (a)(1).)[2] In either of these two situations, however, it is the project (or the change in the project) that is the focus of the inquiry. The inquiry is not whether the project, or the change in the project, is of a certain type. To the extent that this court's decision in *Bakersfield Citizens* might be interpreted as saying that whenever a project includes something called a supercenter, the project becomes a type of project which necessarily triggers an examination of some particularized theoretical environmental effect or effects, we expressly decline to adopt such an interpretation of our *Bakersfield Citizens* decision.

---

[2] All references to Guidelines are to the state CEQA Guidelines, the regulations that implement CEQA (Cal. Code Regs., tit. 14, § 15000 et seq.).

Appellant argues that "because the original EIR . . . contained no analysis of urban decay impacts of any kind, a subsequent or supplemental EIR was presumptively required under *Bakersfield Citizens* and *American Canyon Community*." Even if we were to assume that a "supercenter" was something with a precise definition (such as, hypothetically, a retail establishment which sells both groceries and other merchandise and is of a size which meets or exceeds a certain minimum square footage), we still reject appellant's contention that under *Bakersfield Citizens*, the inclusion of a "supercenter" in a project, without more, automatically triggers a requirement of an EIR analysis of whether the project will cause "urban decay effects."

Part III of this court's decision in *Bakersfield Citizens* bore the subheading "Urban Decay." (*Bakersfield Citizens, supra*, 124 Cal.App.4th at p. 1204.) We stated there that "when there is evidence suggesting that the economic and social effects caused by the proposed shopping center ultimately could result in urban decay or deterioration, then the lead agency is obligated to assess this indirect impact." (*Id.* at p. 1207.) The *Bakersfield Citizens* decision described at length in part III the evidence supporting the decision's conclusion that an analysis of potential effects of urban decay was required. These included: (1) the already-described report of a professor of economics, who opined that there would be " 'deterioration of buildings, improvements, and facilities' " and " 'physical effects associated with blight-like conditions, which include visual and aesthetic impacts accompanying the physical deterioration' " (*id.* at p. 1209); (2) comments by "numerous individuals . . . about urban decay during the administrative process" (*id.* at p. 1210); and (3) "numerous studies and articles analyzing the adverse effects other communities in California . . . have experienced as a result of saturation of a market area with super-sized retailers." (*Id.* at pp. 1209–1210, fn. omitted.) We did not say in *Bakersfield Citizens* that a project which includes a supercenter automatically and without more requires an analysis of potential urban decay effects.

In *Bakersfield Citizens* we applied Guidelines section 15064, which states in pertinent part that "[e]conomic and social changes resulting from a project shall not be treated as significant effects on the environment" but also that "[w]here a physical change is caused by economic or social effects of a project, the physical change may be regarded as a significant effect in the same manner as any other physical change resulting from the project." (Guidelines, § 15064, subd. (e); see *Bakersfield Citizens, supra*, 124 Cal.App.4th at pp. 1205–1206.) We cited and discussed *Citizens Assn. for Sensible Development of Bishop Area v. County of Inyo* (1985) 172 Cal.App.3d 151 [217 Cal.Rptr. 893] (*Bishop*), and *Citizens for Quality Growth v. City of*

*Mt. Shasta* (1988) 198 Cal.App.3d 433 [243 Cal.Rptr. 727] (*Mt. Shasta*), two cases which applied Guidelines section 15064. (See *Bakersfield Citizens, supra*, 124 Cal.App.4th at pp. 1205–1206; *Bishop, supra*, 172 Cal.App.3d at pp. 169–171; *Mt. Shasta, supra*, 198 Cal.App.3d at pp. 445–446.) We also quoted Guidelines section 15131, which similarly states: "Economic or social effects of a project shall not be treated as significant effects on the environment. An EIR may trace a chain of cause and effect from a proposed decision on a project through anticipated economic or social changes resulting from the project to physical changes caused in turn by the economic or social changes. The intermediate economic or social changes need not be analyzed in any detail greater than necessary to trace the chain of cause and effect. The focus of the analysis shall be on the physical changes." (Guidelines, § 15131, subd. (a); accord, *Bakersfield Citizens, supra*, 124 Cal.App.4th at p. 1205.)

In the case presently before us, however, the EIR for the project was certified in November of 2006. After the site plan was revised in May of 2007, the City prepared the Addendum to the EIR. The Addendum was approved by the city council on August 1, 2007, when the project was approved by the city council when it approved the development agreement for the project. No one at the August 1, 2007 city council meeting presented any objection to the legal adequacy of the Addendum. No one presented any evidence or argument that approval of the project with the revised site plan would or might result in urban decay, or even that approval of the project with the revised site plan might cause economic or social change, which might lead to urban decay. Instead, appellant filed her superior court action contending that the revision of the site plan to include a 198,484 square foot building appellant calls a supercenter required the City to conduct an analysis of whether the project would cause urban decay. As we have explained, we find no such requirement in our *Bakersfield Citizens* decision.

### D.   *The City Properly Applied Guidelines Section 15164*

The City in this case relied on section 15164 of the CEQA Guidelines. "[C]ourts should afford great weight to the Guidelines except when a provision is clearly unauthorized or erroneous under CEQA." (*Laurel Heights Improvement Assn. v. Regents of University of California, supra*, 47 Cal.3d at p. 391, fn. 2.) Guidelines section 15164 provides:

"(a) The lead agency or a responsible agency shall prepare an addendum to a previously certified EIR if some changes or additions are necessary but none of the conditions described in Section 15162 calling for preparation of a subsequent EIR have occurred.

"(b) An addendum to an adopted negative declaration may be prepared if only minor technical changes or additions are necessary or none of the conditions described in Section 15162 calling for the preparation of a subsequent EIR or negative declaration have occurred.

"(c) An addendum need not be circulated for public review but can be included in or attached to the final EIR or adopted negative declaration.

"(d) The decision-making body shall consider the addendum with the final EIR or adopted negative declaration prior to making a decision on the project.

"(e) A brief explanation of the decision not to prepare a subsequent EIR pursuant to Section 15162 should be included in an addendum to an EIR, the lead agency's required findings on the project, or elsewhere in the record. The explanation must be supported by substantial evidence." (Guidelines, § 15164.)

Section 15162 of the Guidelines, which is expressly referred to in section 15164 of the Guidelines, attempts to clarify Public Resources Code section 21166, and states in pertinent part:

"(a) When an EIR has been certified or a negative declaration adopted for a project, no subsequent EIR shall be prepared for that project unless the lead agency determines, on the basis of substantial evidence in the light of the whole record, one or more of the following:

"(1) Substantial changes are proposed in the project which will require major revisions of the previous EIR or negative declaration due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified significant effects;

"(2) Substantial changes occur with respect to the circumstances under which the project is undertaken which will require major revisions of the previous EIR or negative declaration due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified significant effects; or

"(3) New information of substantial importance, which was not known and could not have been known with the exercise of reasonable diligence at the time the previous EIR was certified as complete or the negative declaration was adopted, shows any of the following:

"(A) The project will have one or more significant effects not discussed in the previous EIR or negative declaration;

"(B) Significant effects previously examined will be substantially more severe than shown in the previous EIR;

"(C) Mitigation measures or alternatives previously found not to be feasible would in fact be feasible and would substantially reduce one or more significant effects of the project, but the project proponents decline to adopt the mitigation measure or alternative; or

"(D) Mitigation measures or alternatives which are considerably different from those analyzed in the previous EIR would substantially reduce one or more significant effects on the environment, but the project proponents decline to adopt the mitigation measure or alternative." (Guidelines, § 15162.)

■ Section 21166 states that "no subsequent or supplemental environmental impact report shall be required . . . unless one or more of" the listed triggering events occurs. Section 15162 of the Guidelines does not mention the "supplemental environmental impact report." That document is addressed in Guidelines section 15163, which refers to the document as a "supplement to an EIR" and explains that "[t]he lead or responsible agency may choose to prepare a supplement to an EIR rather than a subsequent EIR if: [¶] (1) Any of the conditions described in Section 15162 would require the preparation of a subsequent EIR, and [¶] (2) Only minor additions or changes would be necessary to make the previous EIR adequately apply to the project in the changed situation." (Guidelines, § 15163, subd. (a).) A supplement to an EIR "need contain only the information necessary to make the previous EIR adequate for the proposed project as revised" and "may be circulated by itself without recirculating the previous draft or final EIR." (Guidelines § 15163, subds. (b) & (d).) Both a subsequent EIR and a supplemental or "supplement to an" EIR are given the same notice and public review as is given to a draft EIR. (See Guidelines, §§ 15162, subd. (d), 15163, subd. (c), 15087.) An addendum, however, is not. (Guidelines, § 15164, subd. (c).)

Appellant argues that the CDD's May 4, 2007 approval of the revised site plan constituted approval of the project, and that because the Addendum did not yet exist at that time, the decisionmaking body did not consider the Addendum prior to making a decision on the project. Subdivision (d) of Guidelines section 15164 provides that "[t]he decision-making body shall consider the addendum with the final EIR or adopted negative declaration prior to making a decision on the project." " 'Decision-making body' means any person or group of people within a public agency permitted by law to approve or disapprove the project at issue." (Guidelines, § 15356.) "The term

'project' refers to the activity which is being approved and which may be subject to several discretionary approvals by governmental agencies. The term 'project' does not mean each separate governmental approval." (Guidelines, § 15378, subd. (c).) The evidence was undisputed that "the project is infeasible absent the terms of the development agreement . . . ." The development agreement was approved by the city council on August 1, 2007, and the council approved the Addendum as well at that time. The decisionmaking body was thus the council, which acted on August 1, and not the CDD, who approved the revised site plan on May 4. "With private projects, approval occurs upon the earliest commitment to issue or the issuance by the public entity of a discretionary contract, grant, subsidy, loan, or other form of financial assistance, lease, permit, license, certificate, or other entitlement for use of the project." (Guidelines, § 15352, subd. (b).) In this case the City issued a discretionary contract, namely the development agreement, on August 1, 2007. That is when the project was approved.

Appellant argues that she did not receive notice of the change in the project, but that argument is based upon her premise, which we reject, that the changed project was approved on May 4, not on August 1. In fact, item "C-3" of the city council's August 1, 2007 agenda was "Consideration of a Resolution Approving an Addendum to the Previously Certified Environmental Impact Report for the Madera Town Center Project at the Northeast Corner of the Avenue 17/Freeway 99 Interchange And Continued Public Hearing and Consideration of Adoption of an Ordinance Approving and Adopting a Development Agreement between Zelman Retail Partners and the City of Madera." At the August 1, 2007 city council meeting, Mayor Mindt announced "We will now consider Item C-3 which is consideration of resolution approving addendum to the previously certified environmental impact report for the Madera Town Center project." As we already mentioned in our statement of facts above, no one spoke against the proposed resolution approving the Addendum, and the city council adopted that resolution (resolution No. 07-238). Appellant has demonstrated no failure to comply with CEQA.

## II.

### THE MADERA MUNICIPAL CODE*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante*, page 41.

## DISPOSITION

The judgment is affirmed. Costs to respondents.

Levy, J., and Cornell, J., concurred.